IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Mineral Park, Inc., et al.,[1] | ) | Case No.: 14-11996 (___) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

## DECLARATION OF MARC S. LEBLANC IN SUPPORT OF FIRST DAY MOTIONS

I, Marc S. LeBlanc, hereby declare that the following is true to the best of my knowledge, information and belief:

1.    I am the Corporate Secretary of the above-captioned debtors and debtors in possession (together, the "Debtors"). I am also a member of the Board of Directors of each of the Debtors. I have held these positions with: (a) Debtor Lodestrike Resources Ltd. ("Lodestrike") since June 2006, (b) Debtor Mercator Mineral Park Holdings Ltd. ("Mineral Park Holdings") since January 2007, (c) Debtor Mineral Park, Inc. ("Mineral Park") since June 2011, and (d) Debtor Bluefish Energy Corporation ("Bluefish") since June 2011. I have been employed by the ultimate parent of the Debtors, Mercator Minerals Ltd. ("MML"), a publicly-traded company on the Toronto Stock Exchange, on a full-time basis since January 2005. Prior to that, I was a part-time employee and provided consulting services to MML and a number of other public mining companies in the areas of corporate finance and regulatory affairs. I am also

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Mineral Park, Inc. (6900); Bluefish Energy Corporation (6843); Mercator Mineral Park Holdings Ltd. (3520); and Lodestrike Resources Ltd. (7923). The mailing address for Debtors is Mineral Park, Inc. and Bluefish Energy Corporation is 8275 N. Mineral Park Road, Golden Valley AZ  86413. The mailing address for Debtors Mercator Mineral Park Holdings Ltd. and Lodestrike Resources Ltd. is #1050 - 625 Howe Street Vancouver BC  V6C 2T6.

Corporate Secretary of MML and a Director and Corporate Secretary of several other non-debtor

affiliates of the Debtors. I hold a Bachelor of Arts Degree from Simon Fraser University and an

Associate's Degree in Legal Studies from Capilano University.

2.      Based on my positions with the Debtors, I am familiar with the day-to-day

operations, business affairs, assets and liabilities, and books and records of the Debtors.

3.      In order to enable the Debtors to minimize the adverse effects of the

commencement of their Cases (as defined below) on their business, the Debtors have requested

various types of relief in "first-day" applications and motions (collectively, the "First Day

Motions").[2] The First Day Motions seek relief that is: (a) necessary to enable the Debtors to

maintain going concern value and conduct an orderly sale process; and (b) essential to

maximizing the value of the Debtors' assets for the benefit of their estates and creditors. Certain

of the First Day Motions relate only to Mineral Park Inc. and Mercator Mineral Park Holdings

Ltd., and not Bluefish Energy Corporation and Lodestrike Resources Ltd.

4.      I submit this declaration (the "Declaration") in support of the Debtors'

petitions and First Day Motions. Except as otherwise indicated, all statements in this Declaration

are based upon my personal knowledge, my review of the Debtors' books and records, relevant

documents and other information prepared or collected by the Debtors' employees at my

direction or the direction of the Boards of Directors of the Debtors, or my opinion based on my

experience with the Debtors' operations and financial condition. In making my statements based

on my review of the Debtors' books and records, relevant documents and other information

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the First Day Motions.

prepared or collected by the Debtors' employees, I have relied upon these employees in accurately recording, preparing, or collecting any such documentation and other information.

5.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtors.

6.      Part I of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Part II of this Declaration sets forth the relevant facts in support of the First Day Motions.

## PART I

### A.      Background

7.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion to procedurally consolidate their chapter 11 cases (the "Cases") for administrative purposes only. The Debtors are continuing to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in these Cases.

**B.    Overview of the Debtors and Their Operations**

**Introduction**

8.    The Debtors are wholly owned direct and indirect subsidiaries of MML, a mineral resource company engaged through various subsidiaries in the mining, exploration, development and operation of its mineral properties in Mohave County, Arizona, and Sonora, Mexico.  Debtor Mineral Park is the primary operating entity in these Cases.  Mineral Park's principal asset is the "Mineral Park Mine," a producing copper-molybdenum mine located near Kingman, Arizona.  Debtor Bluefish owns a gas turbine that produces electricity for the Mineral Park Mine.  The remaining two Debtors (Lodestrike and Mineral Park Holdings) are immediate parent holding companies of Mineral Park and Bluefish, respectively.

9.    Founded in 1984, MML is a publicly-traded company registered under the laws of the Province of British Columbia, Canada.  The common shares of MML began trading on the Toronto Stock Exchange (the "TSX") on August 22, 2005, and prior to that, were traded on other Canadian exchanges.  MML is presently traded on the TSX under the trading symbol "ML".

10.    For the fiscal year ending December 31, 2013, Mineral Park had revenue of approximately $222.3 million, mainly as a result of the mining operations at the Mineral Park Mine.  As of the Petition Date, Mineral Park employs approximately 415 people.  Bluefish does not have any employees of its own, but certain employees of Mineral Park allocate a portion of their time to Bluefish.

11.    In light of the commodity price environment, capital market conditions and other challenges, MML commenced a process to review strategic alternatives in mid-2013.

On December 12, 2013, MML announced that it had entered into an arrangement agreement with Intergeo MMC Ltd ("Intergeo") and ancillary documentation to effect a business combination through a plan of arrangement under Canadian law.  In connection with this transaction, Daselina Investments Ltd. ("Daselina"), Intergeo's controlling shareholder, agreed to advance up to $14 million to Mineral Park by way of a bridge loan to provide the company with sufficient funding to stabilize its operations until the transaction could be consummated.  On August 1, 2014, MML announced that the completion deadline for the agreement had not been extended and therefore the arrangement agreement with Intergeo had terminated in accordance with its terms.

12.    In addition to the bridge financing from Daselina, Mineral Park has a prepetition credit facility in place with various lenders, as described further below.  Such financing is senior to the liens and claims of Daselina.  Various defaults have occurred under the senior credit facility and Mineral Park has been operating under a forbearance arrangement with its lenders.  With the expiration of such forbearance on August 15, 2014 and an unwillingness on the part of the lenders to extend any further accommodations to Mineral Park outside of bankruptcy, the Debtors commenced these Cases in order to avoid any disruption in the Debtors' operations and to pursue an orderly process for the sale of their assets.

### The Mineral Park Mine

13.    The Mineral Park Mine encompasses approximately 6,497 acres of contiguous ground in the Wallapai mining district located in the Cerbat Mountains in Northwestern Arizona.  The Mineral Park Mine is comprised of patented and unpatented mining

and mill site claims and fee lands. All of the current mineral resources and current mineral reserves lie within lands wholly owned by Mineral Park.

14.    Mining activity began in the Mineral Park region in approximately 1871. Modern mining operations, consisting of an open pit mine and flotation mill, commenced in approximately 1963. In June 2003, MML purchased 100% of the outstanding shares of Equatorial Mineral Park, Inc. (the predecessor name of Mineral Park).

15.    The Mineral Park Mine is an open pit mine operation that utilizes drilling, blasting, shovel loading and truck hauling to excavate rock. Mineral Park utilizes certain processes to extract minerals from the rock, which are then processed into copper, molybdenum, and silver concentrates and cathode copper for commercial sale.

16.    The copper concentrate produced at the Mineral Park Mine is sold to domestic and offshore smelters through brokers, where it is converted to metallic copper and the by-product silver is recovered. Concentrates are trucked directly to smelters within the United States and to the port of Guaymas, Mexico where they are accumulated for shipment to overseas smelters. Mineral Park receives provisional payment for 90% of payable values contained, pending final settlement. The molybdenum concentrate produced at the Mineral Park Mine is sold to a broker who adjusts pricing for treatment charges and pays Mineral Park directly. Copper cathode production is baled and shipped F.O.B. to the destination designated by Mineral Park's broker.

17.    During 2013, Mineral Park sold approximately 35.9 million pounds of copper and 9.2 million pounds of molybdenum in concentrates, and delivered approximately 0.5 million ounces of silver from production at the Mineral Park Mine.

**Bluefish Gas Turbine Power Generator**

18.    Debtor Bluefish's operations consist of the ownership and operation of an industrial gas turbine power generator, which Bluefish purchased in August 2010.  The generator is housed at a facility located at the Mineral Park Mine, and the power generated at the Bluefish facility is utilized exclusively to supply the Mineral Park Mine.  The power supplied by Bluefish partially satisfies Mineral Park Mine's power requirements, and Mineral Park satisfies the balance of its power requirements through purchases from third parties on the power grid.  Mineral Park pays for power purchases from Bluefish by purchasing natural gas to run the turbine and satisfying other operating obligations of Bluefish.

**The Debtors' Corporate Structure**

19.    The Debtors are composed of four corporate affiliates.  Mineral Park is wholly owned by Debtor Mineral Park Holdings.  Bluefish is wholly owned by Debtor Lodestrike.  Mineral Park Holdings and Lodestrike are sister companies, each of which is wholly owned by MML.

20.    The name Debtor in this case is Mineral Park, a Delaware corporation.  Bluefish is a Nevada corporation.  Both Mineral Park Holdings and Lodestrike are holding companies incorporated in British Colombia, Canada.

**Financing and Significant Indebtedness**

21.    <u>Mineral Park</u>.  In April 2010, Mineral Park, as borrower, and Société Genérale, for itself and in its capacity as administrative agent (in such capacity, the "<u>Administrative Agent</u>") for certain lenders (collectively, the "<u>Lenders</u>"), entered into that certain *Credit Agreement*, dated as of April 26, 2010, as amended, supplemented or otherwise modified from time to time prior to the date hereof (the "<u>Credit Agreement</u>").  Pursuant to the Credit Agreement, the Lenders agreed to provide credit facilities to Mineral Park totaling $130.0 million comprised of a $100.0 million non-revolving credit facility loan and a $30.0 million revolving credit facility loan.  The proceeds of the Credit Agreement were used:  (a) to retire pre-existing obligations under certain secured notes (substantially reducing the interest burden relating thereto), (b) for general working capital requirements and other general corporate purposes of Mineral Park, and (c) to pay fees and expenses related to the Credit Agreement.

22.    Mineral Park was also party to the following four hedging arrangements with the individual Lenders:  (a) that certain *ISDA Master Agreement* with Société Génerale ("<u>SG</u>"), dated as of April 26, 2010, and related confirmations (as amended, the "<u>SG Risk Management Agreements</u>"), (b) that certain *ISDA Master Agreement* with Portigon AG, New York Branch (formerly WestLB AG, New York Branch) ("<u>Portigon</u>"), dated as of April 26, 2010, and related confirmations (as amended, the "<u>Portigon Management Agreements</u>"), (c) that certain *ISDA Master Agreement* with Barclays Bank PLC ("<u>Barclays</u>"), dated as of April 26, 2010, and related confirmations (as amended, the "<u>Barclays Risk Management Agreements</u>"), and (d) that certain *ISDA Master Agreement* with Credit Suisse International ("<u>CS</u>"), dated as of

April 26, 2010, and related confirmations (as amended, the "CS Risk Management Agreements," together with the SG Risk Management Agreements, the Portigon Risk Management Agreements and the Barclays Risk Management Agreements, the "Risk Management Agreements") (CS, SG, Portigon and Barclays are hereinafter collectively referred to as the "Qualified Risk Management Lenders," and together with the Administrative Agent and the Lenders are hereinafter collectively referred to as the "Finance Parties"). Mineral Park's obligations under the Risk Management Agreements also constitute obligations under the Credit Agreement and are secured by the same assets as the obligations under the Credit Agreement. Each of the Risk Management Agreements has been terminated.

23.    On October 23, 2012, Mineral Park and the Lenders amended the Credit Agreement to, among other things, consolidate the existing loans into a single $91.7 million term loan and to establish: (i) a debt service reserve account; and (ii) a maintenance reserve account. As of the Petition Date, there are minimal balances in such reserve accounts. In addition, Mineral Park has a proceeds account (the "Proceeds Account") that contains all proceeds of the company's sales of copper, molybdenum and silver. The Proceeds Account is held in the name of Mineral Park and held on deposit with the Administrative Agent.

24.    All of the obligations owing to the Lenders under the Credit Agreement are secured by liens (the "Prepetition Liens") on substantially all of Mineral Park's assets (the "Prepetition Collateral"), including cash collateral ("Cash Collateral"). The Prepetition Liens are subject to certain "Permitted Liens" as defined in the Credit Agreement, including liens arising from the Intercompany Note (as defined below).

25.    As of the Petition Date, Mineral Park's obligations under the Credit Agreement totaled $86,786,667 in principal, plus accrued interest and fees, plus $16,183,108 outstanding to the Qualified Risk Management Lenders under the Risk Management Agreements.  Debtor Mineral Park Holdings has guaranteed Mineral Park's obligations under the Credit Agreement and pledged the stock of Mineral Park to secure such obligations.  MML has also guaranteed the obligations under the Credit Agreement, in part.  Debtors Bluefish and Lodestrike are not obligors under the Credit Agreement.

26.    In 2008, Mineral Park entered into an agreement (the "MPI Silver Purchase Agreement") with Mercator Minerals (Barbados), Ltd. ("MMBL"), a wholly-owned non-debtor subsidiary of MML.  Pursuant to the MPI Silver Purchase Agreement, Mineral Park agreed to sell to MMBL, and MMBL agreed to purchase from Mineral Park, an amount of silver equal to one hundred percent (100%) of the number of ounces of silver mined, produced, extracted or otherwise recovered from Mineral Park's mining properties for so long as silver is mined, produced, extracted or otherwise recovered therefrom.

27.    Pursuant to a separate silver purchase agreement (the "Silver Wheaton Purchase Agreement") between MMBL, MML and Silver Wheaton (Caymans) Ltd. ("Silver Wheaton"), MMBL agreed to sell its purchased silver to Silver Wheaton.  Under the Silver Wheaton Purchase Agreement, Silver Wheaton made an up-front payment of $42 million in cash to MMBL.  MML guaranteed the repayment obligations of MMBL under the agreement, subordinate to certain claims.  MMBL loaned $40 million in cash to MML which in turn loaned $40 million in cash to Mineral Park, and Mineral Park issued a promissory note in favor of MML

in the amount of $40 million (the "Intercompany Note"). The Intercompany Note was secured

by a deed of trust against the silver in Mineral Park's mining properties in favor of MML. In

turn, MML assigned its interests in the note and associated deed of trust to Silver Wheaton (the

"Silver Wheaton Lien"). In 2013, MML, MPI and MMBL entered into a deferral agreement

whereby Mineral Park, would for a period of up to one year, defer up to fifty percent (50%) of

the refined silver that Mineral Park is obligated to deliver to MMBL under the terms of the Silver

Wheaton Purchase Agreement. As of the Petition Date, the face amount outstanding under the

Intercompany Note held by Silver Wheaton is $50 million. Mineral Park reserves all rights to

dispute the Silver Wheaton Lien and whether any amounts remain owed under the Intercompany

Note. Pending the resolution of such dispute, Mineral Park will reserve all cash proceeds

generated from the sale of silver on a post-petition basis.

28.     As noted above, Daselina extended bridge financing to Mineral Park as

part of the arrangement agreement with Intergeo. As of the Petition Date, Mineral Park's

principal obligations to Daselina total $13.0 million. Daselina's claims are secured by liens on

substantially all of the Debtors' assets, junior to the liens and claims of the Administrative

Agent, the Lenders, and Silver Wheaton.

29.     As of the Petition Date, Mineral Park's general unsecured debt, consisting

primarily of trade debt, totals approximately $11.5 million.

30.     Bluefish. In August 2010, Bluefish entered into an agreement to purchase

a LM6000 PF Sprint Gas Turbine from GE Packaged Power, Inc. Bluefish's principal business

is the sale of electrical power to Mineral Park pursuant to the terms of a *Power Purchase*

*Agreement* dated as of December 15, 2010. Bluefish financed the purchase of the gas turbine with a loan from Trafigura AG, as lender (in such capacity, the "Bluefish Prepetition Lender") under that certain *Master Loan and Security Agreement*, dated as of October 21, 2010, as amended, supplemented or otherwise modified from time to time prior to the date hereof (the "Bluefish Prepetition Financing Agreement"). The original principal amount of the loan under the Bluefish Prepetition Financing Agreement was $20.8 million. Bluefish pledged substantially all of its assets in favor of the Bluefish Prepetition Lender to secure the obligations under the Bluefish Prepetition Financing Agreement. Debtor Lodestrike has pledged the stock of Bluefish to secure such obligations. Mineral Park also has entered into a long term off-take contract with the Bluefish Prepetition Lender for certain annual volumes of copper concentrate. As of the Petition Date, the outstanding principal amount owed to the Bluefish Prepetition Lender under the Bluefish Prepetition Financing Agreement is approximately $13.4 million. Debtors Mineral Park and Mineral Park Holdings are not obligors under the Bluefish Prepetition Financing Agreement.

31.     As of the Petition Date, Bluefish's general unsecured debt totals approximately $2.5 million.

**C.     Circumstances Leading to the Commencement of the Chapter 11 Case**

32.     As discussed above, MML has been engaged in a process to review strategic alternatives, which culminated in the arrangement agreement with Intergeo. With the termination of that agreement on August 1, 2014, MML has been evaluating its options, none of which have been acceptable to the Lenders with respect to Mineral Park.

33.    Given the present state of affairs facing the Debtors and Mineral Park's inability to obtain a further forbearance from the Lenders, the Debtors have commenced these Cases in order to preserve value and to provide an opportunity to effectuate an orderly sale process.

## PART II

### A.    First Day Motions

34.    In order to enable the Debtors to minimize the adverse effects of the commencement of the Cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.

35.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief based upon my tenure at the Debtors, and I believe that the type of relief sought in each of the First Day Motions:  (a) is necessary to maintain going concern value and effectuate an orderly sale of assets; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.  Accordingly, and to this extent, I incorporate herein by reference the factual statements set forth in the First Day Motions.

36.    It is my further belief that, with respect to those First Day Motions requesting the authority to pay discrete prepetition claims (*e.g.*, those First Day Motions seeking relief related to the Debtors' obligations to their employees, critical vendors and shippers), the relief requested is essential to the Debtors' efforts to preserve and maximize value in these Cases and avoid immediate and irreparable harm to the Debtors and their estates and creditors.

37.     I believe that any diminution in the limited relief requested in the First Day Motions could have an immediate and irreparable harmful impact upon the value of the estates' assets to the detriment of all of the Debtors' stakeholders.  The Debtors believe that payment of those selected prepetition claims identified in the First Day Motions will forestall such irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

**B.     Cash Collateral Motion**

38.     Mineral Park has an urgent and immediate need for the use of Cash Collateral, including cash currently held in the Proceeds Account.  Mineral Park has not obtained post-petition financing and, without the use of Cash Collateral, it will not be able to continue operations or to effectuate an orderly sale process that will maximize value for creditors.

39.     Mineral Park is an operating entity that employs approximately 415 people.  Mineral Park is the second largest employer in Mohave County, Arizona, second only to the County itself.  Mineral Park currently has two twelve-hour shifts working in ongoing mining operations in Mineral Park, Arizona.  Bluefish operates an on-site power facility that provides power to the mine.  Bluefish does not intend to make payments or otherwise utilize Cash Collateral on a postpetition basis, but Mineral Park will make payments on behalf of Bluefish in consideration of power supplied to Mineral Park by Bluefish postpetition.

40.     Without immediate access to Cash Collateral, Mineral Park would be forced to immediately cease mining operations and terminate all employees, causing immediate

and irreparable harm to these estates.  In order to preserve and maximize going concern value, Mineral Park urges the Court to approve the Cash Collateral Motion.

41.    <u>I am informed that the Administrative Agent will consent to entry of the Interim Order.</u>  I am also informed that Daselina is not entitled to adequate protection pursuant to its intercreditor agreement with the Administrative Agent.  Silver Wheaton is adequately protected by Mineral Park's agreement to reserve the postpetition proceeds of silver sales.  Further, I am informed and believe that the secured parties will be adequately protected by Mineral Park's proposed use of cash collateral in at least three ways:  (1) the going concern value of Mineral Park's business will be preserved, at least for a time; (2) Mineral Park is projected to be breakeven or better on a cash flow basis based on various reasonable assumptions relative to commodity pricing, equipment availability and other key operating parameters; and (3) Mineral Park is proposing to provide further adequate protection in favor of the Administrative Agent in the form of an adequate protection lien as set forth in the proposed Interim Order.

42.    Mineral Park requires immediate access to cash collateral in order to remain operational.  An operating mine that has knowledgeable and experienced employees in place and is generating ongoing revenues is significantly more valuable than an idle mine.

43.    Without the ability to use Cash Collateral, Mineral Park would be unable to meet its postpetition obligations and would be unable to fund its working capital needs, thus causing irreparable harm to the value of these estates and ending Mineral Park's reorganization efforts.  Accordingly, Mineral Park respectfully requests that, pending the hearing on a Final Order, the proposed Interim Order be approved in all respects.

**C.    Employee Wages and Benefits Motion**

44.    Mineral Park employs approximately 415 employees in hourly, salaried, supervisory, management, sales, administrative and production positions to perform the functions necessary to effectively and efficiently operate the Mineral Park's business (collectively, the "Employees").

45.    To minimize the personal hardships that the Employees (both those who have been terminated and those are being retained) will suffer if its prepetition employment-related obligations are not paid or honored, to maintain the morale of the retained Employees during this critical time, and to minimize disruptions to Mineral Park's ongoing business operations and the administration of Mineral Park's estate, Mineral Park seeks authority, in its sole discretion, to:  (i) pay unpaid prepetition claims for wages, salaries, and other compensation including Employees' 401(k) plan contributions (collectively, the "Unpaid Wages") to the Employees (both those who have been terminated and those who are being retained) up to $12,475 per employee; (ii) pay and remit the Withholding Obligations (defined below) to the proper third parties; (iii) pay the Payroll Administrative Fees and the Benefits Administrative Fees (each as defined below); (iv) honor and maintain certain benefits (as more fully set forth below) offered by Mineral Park (the "Benefits"); (v) reimburse certain unpaid business Expense Reimbursement Obligations (defined below) incurred prepetition by the Employees; and (vi) pay all costs incident to the foregoing as set forth in detail below.

### Mineral Park's Employees and Wages

46.    Mineral Park's average aggregate payroll including wages and salaries (collectively, "Wages") is approximately $925,000.  The Employees are paid one week in

arrears, on a bi-weekly basis every other Friday, with direct deposits or checks issued on the

Friday after the close of each pay period.  Mineral Park's last payroll was made on August 15,

2014 and covered Wages earned through August 9, 2014.

47.     As of the Petition Date, Mineral Park owes an estimated $990,000 for the

gross amount of earned but Unpaid Wages for Employees.[3]  Mineral Park seeks authority to pay

the total amount of Unpaid Wages for Employees up to a total aggregate amount of $990,000.

48.     Three of Mineral Park's management and accounting level personnel are

employed through a non-Debtor affiliate, Mercator Minerals (USA) Ltd. ("MMU").  These

individuals (the "MMU Employees") primarily perform services for Mineral Park.  The cost of

the MMU Employees on a going forward basis will be paid by Mineral Park by way of payments

by Mineral Park to MMU.  Mineral Park does not have any accrued, but unpaid amounts owing

to MMU with respect to the MMU Employees for the prepetition period, but intends to continue

to pay MMU for the services of the MMU Employees on a postpetition basis.

49.     In the ordinary course of its business, Mineral Park routinely withholds

from Wages certain amounts that Mineral Park is required to transmit to taxing authorities for

purposes such as Social Security and Medicare, federal and state or local income taxes, and make

the employer tax payments on account of such taxes (collectively, the "Employer Tax

Obligations").  The Employer Tax Obligations are remitted directly by Mineral Park to the

various governmental entities.

---

[3]  No Employee is owed more than $12,475 in Unpaid Wages.

## Benefits

50.     Mineral Park also withholds contributions to Mineral Park's health, vision, dental benefit plans and insurance plans, 401(k) contributions and 401(k) loan repayments, employee medical contributions, and withholdings for garnishment, or child support or similar obligations pursuant to court order or law (the "Benefits Withholdings" and, together with the Employer Tax Obligations, the "Withholding Obligations").

51.     Mineral Park estimates that approximately $290,000 of the Unpaid Wages should be withheld by Mineral Park on account of the Employer Tax Obligations and Benefits Withholdings.  Mineral Park seeks authority to withhold such amounts from the paychecks and remit such amounts to the applicable governmental entities and other third parties in the ordinary course of business.

52.     Mineral Park provides Employees, in the ordinary course of business, with certain Benefits, including, but not limited to (a) medical, dental and vision insurance, (b) stop loss coverage, (c) workers' compensation, (d) vacation time, and (g) other miscellaneous employee benefits, each as described below.

53.     Three of the participants in Mineral Park's benefits programs are employed by a non-Debtor affiliate, MMU.  These individuals primarily perform services for Mineral Park.  The cost of providing Benefits to the MMU Employees is paid directly by Mineral Park and reflected as an intercompany receivable against MMU.

54.     Mineral Park provides certain health and related benefit plans to its Employees, including a medical plan, dental, and vision (collectively, the "Health Plans"), life

insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Benefit Plans"), as described in more detail below.

55.     For most of the Health Plans, Employees make payroll contributions and Mineral Park deducts the Employees' portion of the Health Plan costs owing under the Health Plans from the Employees' Wages each pay period.  As required by law, Mineral Park also offers the Health Plans to its former employees who have elected COBRA coverage.  In the case of the former employees who have elected COBRA coverage, Mineral Park charges an actuarial premium to these former employees.  Such former employees pay the full amount of the premiums due (plus a small per party administrative fee) to a third party COBRA administrator, B.A.S.I.C. Western USA, Inc.  As part of the relief requested hereunder, Mineral Park requests authority to pay prepetition claims payments relating to COBRA coverage (which are partially funded by premium payments by the former employees) and to continue to make such payments in the ordinary course of business for all its Health Plans.  The average quarterly fee that Mineral Park pays to B.A.S.I.C. Western USA is approximately $815, and Mineral Park does not currently owe any prepetition fees.

**Medical Plan**

56.     Mineral Park provides medical and prescription drug coverage through a self-funded plan (the "Medical Plan").  Mineral Park provides its Medical Plan through Mineral Park's third-party administrator, Blue Cross Blue Shield of Arizona ("BCBS").

57.     Mineral Park pays the net claims amount due after the Employees' deductible, co-pays and coinsurance for qualified health services.  When claims are submitted to

BCBS for care provided to Employees or its dependents, BCBS invoices Mineral Park each month for the claims payable by the Plan and the Employee is billed directly by the provider for their remaining share of the deductible, copays and coinsurance. Mineral Park makes payments to BCBS each month for claims received by BCBS in the previous month. Typically, there is a delay of approximately 2 to 3 months between the time that Employees receive services and when health care providers submit their claims to BCBS for payment.

58.    In 2011/2012, Mineral Park paid approximately $2,138,671 in claims, in 2012/2013, Mineral Park paid approximately $2,989,113 in claims, and in 2013/2014, Mineral Park paid approximately $3,107,385 in claims. For the past three months, Mineral Park is averaging monthly payments of approximately $210,000 for claims, although this amount can vary widely and can be somewhat unpredictable based on Mineral Park's inability to predict the number or amount of claims that may be submitted by Employees in any given month. To limit its total exposure to medical claims, Mineral Park maintains stop-loss insurance coverage through BCBS. Mineral Park pays a monthly stop-loss and administrative fees to BCBS in the amount of approximately $90,000, in advance. As of the Petition Date, Mineral Park estimates it owes up to $630,000 for claims for services rendered to Employees but not yet submitted to BCBS on account of the Medical Plans (the "Medical Plan Obligations").

59.    Mineral Park's monthly contribution to claims and fees due under the Medical Plan is partially defrayed by deductions from Employees' Wages. Each pay period, Mineral Park deducts from the Employees' Wages, the Employees' portion of the Medical Plan

contribution, which amount depends upon the plan they select according to the chart below:

|  | **Employee** | **Employee & Spouse** | **Employee & Children** | **Employee & Family** |
|---|---|---|---|---|
| **$1000 Deductible** | $71.72 | $140.50 | $121.40 | $202.90 |
| **$750 Deductible** | $91.04 | $180.04 | $155.32 | $260.78 |
| **$2500/HSA Deductible** | $40.65 | $77.10 | $66.97 | $110.16 |

60.    As of the Petition Date, no payments relating to this program were past due or delinquent.  In an abundance of caution, and due to both the difficulty estimating the claims that may have been submitted by the Employees prior to the filing and the time lag between the time that services are rendered and such claims are submitted to BCBS, Mineral Park seeks authority to pay up to three months of invoices to BCBS not to exceed $630,000 on account of prepetition periods in the event that amounts may be owing to BCBS on its Medical Plan for which Mineral Park is not yet aware.  Mineral Park seeks authority to continue to offer its Medical Plan postpetition in the ordinary case of business in its discretion.

**Dental**

61.    Mineral Park also offers dental coverage administered by Guardian for Employees and their eligible dependents (the "Dental Plan").  As of the Petition Date, Mineral Park owes to Guardian $25,000 for the November 2014 invoice.  The Dental Plan pays 100% of preventative services, 80% of basic services, and 50% of major services and orthodontics, in each case after satisfaction of a $50 per employee/$150 per family deductible paid by the

Employee, and pays a maximum of $1,500 per year for each covered individual and, for orthodontics, $1,500 lifetime for each covered individual.

62.    Mineral Park's monthly contribution to claims and fees due under the Dental Plan is partially defrayed by deductions from Employees' Wages. Each pay period, Mineral Park deducts from the Employees' Wages, the Employees' portion of the Medical Plan contribution, which amount depends upon the plan they select according to the chart below:

|  | **Employee** | **Employee & Spouse** | **Employee & Family** |
|---|---|---|---|
| **Employee Premium** | $1.87 | $3.72 | $6.81 |

63.    Mineral Park seeks authority to continue to offer the Dental Plan postpetition in the ordinary course of business in its discretion and to remit any prepetition amounts owing on account of the Dental Plan. Since the Dental Plan premiums are paid in advance, Mineral Park believes that no prepetition amounts are due as of the Petition Date. However, in an abundance of caution, Mineral Park requests authorization to pay prepetition claims on account of the Dental Plan up to the amount of $25,000.

**Vision Services Plan**

64.    Mineral Park also provides its eligible Employees with voluntary vision insurance through Guardian (the "Vision Plan"). This coverage is paid 100% by Mineral Park for basic eye examination and frames while in network. Out of network charges to employees may apply. Also, employees incur co-pays for all other services. As of the Petition Date, Mineral Park owes to Guardian $4,600 for the November 2014 invoice.

65.     Mineral Park seeks authority to continue to offer the Vision Plan postpetition in the ordinary course of business in its discretion and to remit any prepetition amounts owing on account of the Vision Plan up to the amount of $25,000.

## Stop Loss Coverage

66.     As noted above, Mineral Park purchased stop loss coverage (the "Stop Loss Coverage") through BCBS for the self-funded health care plan described above to cap Mineral Park's exposure for claims under the Medical Plan.  The Stop Loss Coverage, together with BCBS's administrative fees under the Health Plan, costs Mineral Park approximately $90,000 per month.  Mineral Park believes that as of Petition Date, no costs relating to this program were outstanding and payable to BCBS.  Mineral Park seeks authority to continue to pay for its Stop Loss Coverage postpetition in the ordinary case of business in its discretion.

## Life and Disability Insurance

67.     Mineral Park provides its Employees with life insurance ("Life Insurance"), short-term disability insurance ("Disability Insurance"), and accidental death and dismemberment insurance ("AD&D Insurance"), each as more fully described below, as well as access to certain voluntary coverage including long-term disability insurance and supplemental life insurance (the "Voluntary Insurance Programs").  Mineral Park seeks authority to continue to offer the Life Insurance, AD&D Insurance, and Disability Insurance postpetition in the ordinary course of business in its discretion.  All premiums are fully paid by the company with the exception of the Voluntary Insurance Programs which are voluntary plans fully paid for by the Employees.  As of the Petition Date, Mineral Park believes that there is less than $5,000 owing

on account of the prepetition period for these programs, which includes amounts due for Voluntary Insurance Program premiums that have been collected from Employees.

68.    <u>Disability Insurance</u>.  Mineral Park provides all Employees with short-term disability benefits (the "<u>Disability Insurance</u>") through a fully insured program with Guardian.  Long-term disability insurance can be purchased by employees at its option. As of the Petition Date, no premiums associated with the long-term disability program were outstanding and payable to Guardian since premiums are paid in advance.

69.    <u>Life Insurance</u>.  Mineral Park provides primary life insurance coverage (the "<u>Life/AD&D Insurance</u>") for certain of its Employees through Guardian.  As of the Petition Date, no costs associated with the primary life insurance program were outstanding and payable to Guardian since premiums are paid in advance.

70.    In an abundance of caution, Mineral Park seeks authority to pay prepetition claims on account of the Life Insurance, Disability Insurance and Life/AD&D Insurance programs in the aggregate amount of $25,000.

71.    Mineral Park also provides its Employees with an option to elect (at their cost) supplemental life insurance and supplemental disability insurance which provide coverage above what Mineral Park offers.  Under these Voluntary Insurance Programs, Mineral Park deducts from the Employees' Wages the applicable premiums and remit those to the applicable third party insurance carriers.  Such amounts are included in the Withholding Obligations discussed above.  Mineral Park seeks authority to continue to offer the Voluntary Insurance Programs postpetition in its ordinary course of business.

## Workers' Compensation

72.     Mineral Park is required to maintain workers' compensation insurance to provide its Employees with coverage for claims arising from or related to its employment with Mineral Park.  Mineral Park currently maintains an annual workers' compensation policy (the "Workers' Compensation Policy") with Zurich American Insurance Company ("Zurich American") pursuant to which Zurich American provides workers' compensation insurance coverage up to the statutory limits.  All premiums have been paid pursuant to Mineral Park's premium financing arrangement with Bank Direct Capital Finance ("BDCF"), and Mineral Park is unaware of any prepetition amounts owing to Zurich American.  Mineral Park has filed a separate motion for authority to pay installments to BDCF under the parties' premium financing agreement that come due postpetition.

73.     Mineral Park submits that the continuance of its Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seeks authority to maintain its workers' compensation insurance in accordance with applicable law postpetition in the ordinary course of business.

## Vacation

74.     Mineral Park provides vacation time to its employees as a paid time-off benefit.  Vacation benefits vary for hourly and salaried Employees.  Most MPI Employees earn 80 hours per year, approximately six MPI Employees earn 160 hours per year, and one MPI Employee earns 320 hours per year.  MMU's Employees earn three to four weeks per year depending on the terms of its respective employment agreements.  Generally, vacation leave that is not used in the year in which it is earned may not be carried over to the next year.  However,

one senior management Employee is allowed to carryover a portion of his vacation allowance and/or be paid for vacation not taken.

75.     Mineral Park requests authority in its discretion to honor existing vacation obligations accrued in the previous year by its Employees and develop any similar policies regarding time away from work and holidays on a post-petition basis and in the ordinary course of Mineral Park's business, so that Employees may use their accrued vacation time in the ordinary course, but Mineral Park does not request authority to pay out accrued prepetition vacation to Employees upon termination without further Court order.

## 401(k) Savings Plans

76.     Mineral Park maintains a 401(k) plan for the benefit of its Employees (the "401(k) Plan"). The 401(k) Plan provides for automatic pre-tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code. Mineral Park formerly paid employer matching contributions to the 401(k) plan, but has discontinued the matching program. As of the Petition Date, there are no accrued but unfunded matching contributions with respect to the 401(k) Plan. Mineral Park utilizes John Hancock as custodian of funds and recordkeeper and Sun West as third-party administrator. Mineral Park pays fees to administer the 401(k) Plan in the amount of approximately $10,000 annually. Mineral Park requests authority, in its discretion, to continue its existing 401(k) Plan and pay any 401(k) fees in the ordinary course of Mineral Park's business.

### Business Expense Reimbursements

77.     Mineral Park customarily reimburses Employees who incur business and relocation expenses in the ordinary course of performing their duties on behalf of Mineral Park. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "Expense Reimbursement Obligations"). The majority of Expense Reimbursement Obligations are paid directly to employees through submission of expense reports by the Employees. Certain senior management Employees can charge Expense Reimbursement Obligations to the Mineral Park-provided VISA credit cards.

78.     It is difficult for Mineral Park to determine the exact amounts of Expense Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of Mineral Park throughout the year vary on a monthly basis. Additionally, there may be some delay (typically up to one month) between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, Mineral Park seeks authority to pay, at its discretion, any prepetition Expense Reimbursement Obligations (including any such amounts due to former Employees) up to a total amount of $25,000 and to continue to honor Expense Reimbursement Obligations incurred postpetition in the ordinary course of Mineral Park's business.

### D.     Cash Management Motion

79.     The Debtors' cash management system (the "Cash Management System") facilitates the timely and efficient collection, management and disbursement of funds used in the

Debtors' businesses. Because of the nature of the Debtors' businesses and the disruption to the businesses that would result if it was forced to close their existing bank accounts, it is critical that the existing Cash Management System remain in place.

80.     The Cash Management System consists of a deposit account (the "Proceeds Account") maintained at SG that is interconnected to two restricted deposit accounts maintained at SG (collectively with the Proceeds Account, the "SG Accounts"), three accounts (the "Mohave Accounts") maintained at Mohave State Bank ("Mohave"), and a deposit account (the "Fifth Third Account" and, collectively with the SG Accounts and the Mohave Accounts, the "Bank Accounts") maintained at Fifth Third Bank ("Fifth Third" and, together with SG and Mohave, the "Banks"). The Proceeds Account receives all customer receipts and funds the operating, payroll, and restricted accounts of the Debtors. Two of the Mohave Accounts are maintained by Mineral Park and utilize funds received from the Proceeds Account for payroll and vendor payments. The third Mohave Account is maintained by Bluefish and receives Mineral Park payments from which Bluefish, in turn, makes loan payments to Trafigura AG and other operations related disbursements from the Fifth Third Account. Bluefish does not intend to make any payments out of the Fifth Third Account absent separate Court order. Finally, two of the SG Accounts (the "SG Reserve Accounts") are reserve accounts which are maintained by the Debtors pursuant to the Debtors' prepetition loan agreements. The SG Reserve Accounts currently have minimal balances. A description of each Bank Account appears in Exhibit B attached to the Cash Management Motion. A diagram showing the role of each account in the Cash Management System is attached as Exhibit C to the Cash Management Motion.

81.    The Debtors derive substantially all of their revenues from the sale of copper, molybdenum and silver concentrates and cathode copper to their customers. Revenues from the Debtors' customers are generally wired directly to the Debtors' Proceeds Account and then transferred, as necessary, to the other Bank Accounts. Mineral Park uses its Bank Accounts at Mohave to make disbursements paid by electronic check runs, manual checks and ACH payments for payroll and payroll taxes, as well as non-payroll items relating to health benefits and vendor payments. The Debtors propose to continue using the Bank Accounts after the Petition Date.

82.    Prior to the Petition Date, Mineral Park and Bluefish engaged in certain intercompany transactions with each other in the ordinary course of business (collectively, the "Intercompany Transactions"). In August 2010, Bluefish entered into an agreement to purchase a LM6000 PF Sprint Gas Turbine from GE Packaged Power, Inc. Bluefish's principal business is the sale of electrical power to Mineral Park pursuant to the terms of a *Power Purchase Agreement* dated as of December 15, 2010. Among other things, pursuant to the Power Purchase Agreement, Mineral Park makes certain operational payments on behalf of Bluefish such as to purchase natural gas, electric energy, and employee costs. These costs are reconciled through Intercompany Transactions. Discrete transfers to intercompany accounts are made in furtherance of the Intercompany Transactions. The Intercompany Transactions are recorded by Mineral Park and Bluefish as intercompany payables, receivables or loans, as applicable.

83.    Maintenance of the Bank Accounts will greatly facilitate the Debtors' operations in chapter 11. The Debtors' customers make regular payments to the existing

collections account by check or electronic transfers, and closing this account, establishing a new account in its place and instructing customers of the changes will substantially disrupt and delay the Debtors' receipt of payments from their customers and payments to their vendors.  To avoid disruptions and delays in the Debtors' receipt of payments and the Debtors' payment of debts incurred postpetition, the Debtors should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts or close unnecessary existing accounts on an as-needed basis.

**E.    Utilities Motion**

84.    In the normal course of business, the Debtors have relationships with various utility companies and providers, excluding Bluefish (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity, waste management, and other services (the "Utility Services") at their business locations.  Various Utility Services are paid by the Debtors and are provided by the Utility Providers set forth on Exhibit A to the Utilities Motion.  The Debtors estimate that their average monthly postpetition payments to the Utility Providers will aggregate approximately $2,086,458, which amount was calculated based on (a) the Debtors' historical monthly average payments to the Utility Providers and (b) projected ongoing utility requirements in light of the cessation of operations at the Debtors' location(s).

85.    Uninterrupted Utility Services are critical to the Debtors' ability to maintain property and their branches for the purpose of selling such assets to prospective purchasers.

86.    The Debtors propose to provide adequate assurance to the Utility Providers by maintaining an aggregate deposit of $1,043,229. This amount, which is equal to approximately two weeks of the Debtors' estimated average postpetition monthly aggregate cost of utility services, will be held in a newly created and segregated account (the "Deposit Account"), within twenty (20) business days of the Petition Date (the "Adequate Assurance Deposit"). The allocation of the Adequate Assurance Deposit amongst the Debtors' respective Utility Providers is set forth on Exhibit A to the Utilities Motion. The Adequate Assurance Deposit shall be maintained with a minimum balance equal to the Debtors' estimated two-week cost of utility services, which may be adjusted by the Debtors to account for the termination of utility services by the Debtors or other arrangements with respect to adequate assurance of payment reached with a Utility Company.

**F.    Shippers and Customs Brokers Motion**

87.    The Debtors' business depends on reliable shipping of products to the Mineral Park Mine, of products from the Mineral Park Mine to processors in Mexico and other locations, and of products to the Debtors' customers. The Debtors' operations therefore depend on the daily receipt and delivery of products. The Debtors contract with shippers and customs representatives, including those listed on Exhibit B to the Shippers and Customs Brokers Motion (the "Shippers and Customs Representatives") who have (or may have) non-bankruptcy law remedies available to secure payment of their claims to ship, store, and deliver their products.

88.    As of the Petition Date, products are in transit with the Shippers and Customs Representatives, and the Debtors owe the Shippers and Customs Representatives

prepetition shipping, customs, and related charges (collectively, the "Shipping and Customs Charges") in the approximate amount of $425,000.

89.    Under some non-bankruptcy laws, shippers and warehousemen may have liens on the goods in their possession, which secure the charges or expenses incurred in connection with the transportation or storage of the goods.

90.    · As set forth above, the Debtors owe the Shippers and Customs Representatives certain amounts for prepetition shipping and storage.  The Debtors believe that such unpaid Shipping and Customs Charges as of the Petition Date total no more than approximately $425,000.  However, in the event that such charges remain unpaid, the Shippers and Customs Representatives likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed.

91.    The Debtors anticipate that the Shippers and Customs Representatives will demand immediate payment from the Debtors.  Even absent a valid lien, the Shippers and Customs Representatives' mere possession (and retention) of the Debtors' goods and supplies could severely disrupt the Debtors' operations and efforts to maximize the value of their estates for the benefit of their creditors.

## G.    Critical Vendors Motion

92.    The Debtors undertook a process to identify key vendors and providers of goods and services and similar counterparties that the Debtors deem essential to maintaining their ongoing business operations (the "Critical Vendors") using the following criteria:

(a) whether a vendor is a sole-source provider; (b) whether certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; (c) whether a vendor is likely to refuse to continue providing goods or services to the Debtors postpetition if its prepetition outstanding balances are unpaid; and (d) if a vendor is not a sole-source provider, whether the Debtors can continue to operate in the ordinary course while a replacement vendor is secured.

93.    The Debtors cannot provide, through their own resources, all of the essential goods and services necessary to operate the mine. Rather, the Debtors purchase goods and services in the ordinary course of business from the third party Critical Vendors to provide them with essential goods and services, including: (a) repair parts for mobile mining equipment which require OEM supplied parts; (b) mill reagents which are used in the metal recovery process; and (c) operating supplies used in the mining process. The Debtors are dependent upon these Critical Vendors to ensure the successful extraction, processing, and delivery of minerals to the Debtors' customers.

94.    The Critical Vendors rely on quick and full payment from the Debtors. Absent such assurance of immediate payment either in part or in whole, the Critical Vendors could refuse to deliver goods and services to the Debtors. This would disrupt and harm the Debtors' businesses and hinder the Debtors' ability to replace any departing Critical Vendors with alternative providers in a timely manner. It may also force the Debtors to obtain services elsewhere at a higher price or in a quality insufficient to satisfy the Debtors' needs. Without the Critical Vendors standing at the ready to provide goods and services to the Debtors, the Debtors'

business would suffer.  The Debtors believe that it would be extremely difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to the Debtors' business.  Given the importance of the services provided by the Critical Vendors, it is imperative that the Debtors be granted, on an emergency basis, the flexibility and authority to satisfy the prepetition claims of the Critical Vendors, as any disruption in the Debtors' ability to provide services to their customers would cause immediate and irreparable damage to the Debtors' business.

**H.      Ordinary Course Professionals Motion**

95.      The Debtors customarily retain the services of various attorneys, accountants, consultants, and other professionals to represent them in matters arising in the ordinary course of their businesses, unrelated to these Cases (each an "Ordinary Course Professional" and collectively, the "Ordinary Course Professionals").  A list of the Ordinary Course Professionals utilized or expected to be utilized by the Debtors during the pendency of these Cases is attached as Exhibit B to the Ordinary Course Professionals Motion.

96.      The Debtors anticipate employing, among others, certain of the Ordinary Course Professionals to perform ongoing services during the pendency of these Cases.  The Ordinary Course Professionals will not be involved in the administration of these Cases.  Rather, they will provide services in connection with the Debtors' operations or services ordinarily provided by in-house counsel to a corporation.

97.      The Debtors cannot continue to operate their businesses as debtors in possession unless they retain and pay for the services of the Ordinary Course Professionals.  The

work of the Ordinary Course Professionals, albeit ordinary course, is directly related to the preservation of the value of the Debtors' estates, even though the amount of fees and expenses incurred by the Ordinary Course Professionals represents only a small fraction of that value.

98.    The operation of the Debtors' businesses would be hindered if the Ordinary Course Professionals were delayed in performing their work on behalf of the Debtors while the Debtors (i) submitted to this Court an application, affidavit, and proposed retention order for each Ordinary Course Professional, (ii) waited until such order was approved before such Ordinary Course Professional continued to render services and (iii) withheld payment of the normal fees and expenses of the Ordinary Course Professionals until they complied with the compensation procedures applicable to Chapter 11 Professionals.

99.    Further, a number of Ordinary Course Professionals may be unfamiliar with the fee application procedures employed in bankruptcy cases. Some Ordinary Course Professionals might be unwilling or unable to assume the administrative and cost burden of such procedures, and may therefore be unwilling to work with the Debtors if these requirements are imposed, forcing the Debtors to incur additional and unnecessary expenses to retain other professionals without such background and expertise, and at potentially higher rates. The uninterrupted services of the Ordinary Course Professionals are vital to the Debtors' remaining operations and their ultimate ability to pursue an orderly restructuring or sale. More importantly, the cost of preparing and prosecuting these retention applications and fee applications would be significant, and such costs would be borne by the Debtors' estates.

100.    I am informed that, although certain Ordinary Course Professionals may hold unsecured claims against the Debtors in respect of prepetition services rendered, none of the Ordinary Course Professionals have an interest materially adverse to the Debtors, their estates, their creditors, or other parties in interest.

## I.    Motion to Extend Time to File Schedules and Statements of Financial Affairs

101.    I am informed that the Debtors have until 30 days after the Petition Date in order to file their schedules of assets and liabilities and statement of financial affairs.  The Debtor request an extension of that deadline by an additional 20 days.

102.    Due to the complexity of the Debtors' financial and contractual arrangements and the substantial burden already imposed on the Debtors' employees by the commencement of these Cases, the Debtors will be unable to complete their schedules and statements by the current deadline.

## J.    Joint Administration Motion

103.    The four Debtors in these cases are affiliated entities.  Joint administration of these chapter 11 cases (a) is warranted because the Debtors' financial affairs and business operations are closely related (as discussed above), (b) will ease the administrative burden on the Court and the parties, and (c) protects creditors of different estates against potential conflicts of interest.

104.    I am informed that joint administration will permit the Clerk of this Court to use a single general docket for each of the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates, which will result in substantial savings to the estates.  Joint administration also will protect parties in interest by ensuring that such parties in interest in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in all of these cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 25, 2014

Marc S. LeBlanc
Corporate Secretary

DOCS_SF:83835.3 57302-001