## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Mineral Park, Inc., et al.,[1] | ) | Case No.: 14-11996 (___) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**MOTION OF DEBTORS MINERAL PARK INC. AND MERCATOR MINERAL PARK HOLDINGS LTD. FOR ENTRY OF INTERIM AND FINAL ORDERS (A) (i) AUTHORIZING THE USE OF CASH COLLATERAL, (ii) PROVIDING ADEQUATE PROTECTION, (iii) MODIFYING THE AUTOMATIC STAY, AND (B) SCHEDULING A FINAL HEARING**

Debtors and debtors in possession Mineral Park Inc. ("Mineral Park") and Mercator

Mineral Park Holdings Ltd. ("Mineral Park Holdings" and together with Mineral Park, the

"Debtors") in the above-captioned cases hereby submit this motion (the "Motion")[2] for entry of

an interim order on an expedited basis (the "Interim Order") substantially in the form attached

hereto as **Exhibit A**, and following a final hearing to be set by the Court (the "Final Hearing"),

entry of a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363 and 507 of

title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules

of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of

the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

authorizing the Debtors to (a) use cash collateral, and (b) provide adequate protection to the

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Mineral Park, Inc. (6900); Bluefish Energy Corporation (6843); Mercator Mineral Park Holdings Ltd. (3520); and Lodestrike Resources Ltd. (7923). The mailing address for Debtors Mineral Park, Inc. and Bluefish Energy Corporation is 8275 N. Mineral Park Road, Golden Valley AZ 86413. The mailing address for Debtors Mercator Mineral Park Holdings Ltd. and Lodestrike Resources Ltd. is #1050 - 625 Howe Street, Vancouver BC V6C 2T6.

[2] For the avoidance of doubt, this Motion does not apply to the bankruptcy cases of Bluefish Energy Corporation or Lodestrike Resources Ltd.

Administrative Agent (as defined below) on behalf of itself and the Finance Parties (as defined below). <u>The Debtors are informed that the Administrative Agent will consent to entry of the Interim Order.</u>

In support of this Motion, the Debtors rely on the *Declaration of Marc S. LeBlanc in Support of First Day Motions* (the "<u>First Day Declaration</u>"). In further support of this Motion, the Debtors represent as follows:

<b><u>JURISDICTION</u></b>

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (M). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 507 of the Bankruptcy Code.

<b><u>RELIEF REQUESTED</u></b>

2.      By this Motion, the Debtors seek the entry of an Interim Order and a Final Order:

     a.      authorizing the Debtors to use cash collateral (the "<u>Cash Collateral</u>") in which the Administrative Agent has or asserts an interest;

     b.      authorizing Mineral Park and Mineral Park Holdings to provide adequate protection to the Administrative Agent and the Finance Parties for any decrease in the value (such decrease being a "<u>Diminution in Value</u>") of its interests in property of the Debtors resulting from (i) the use, sale or lease of the Debtors' property (including the use of Cash Collateral), (ii) the Carve Out (as defined below), or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

     c.      modifying the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and Final Order;

    d.      waiving any applicable stays under the Bankruptcy Rules and providing for the immediate effectiveness of the Interim Order and the Final Order; and

    e.      scheduling a Final Hearing to allow for entry of the Final Order within forty-five (45) days following the Petition Date.

## SUMMARY OF PROPOSED ORDERS

3.      In accordance with Bankruptcy Rules 4001(b) and (d) and Local Rule 4001-(2),

below is a summary[3] of the terms of the proposed use of Cash Collateral:

    a.      <u>Amount of Cash Collateral to Be Used</u>.  (Interim Order ¶ 8).  The Debtors seek to use Cash Collateral in an amount consistent with the expenditures described in the budget, the initial form of which is attached to the proposed Interim Order as Exhibit 1 (the "<u>Budget</u>").

    b.      <u>Parties with an Interest in Cash Collateral</u>.  The principal party with an interest in the Cash Collateral of Mineral Park is Société Genérale, for itself and in its capacity as administrative agent (in such capacity, the "<u>Administrative Agent</u>") on behalf of the Finance Parties, including the lenders (collectively, the "<u>Lenders</u>") under that certain *Credit Agreement*, dated as of April 26, 2010, as amended, supplemented or otherwise modified from time to time prior to the date hereof (the "<u>Credit Agreement</u>").  Pursuant to a junior bridge loan to Mineral Park, Daselina Investments Ltd. ("<u>Daselina</u>") may also assert an interest in Mineral Park's cash collateral.  Daselina's interests are subordinated to those of the Lenders pursuant to an intercreditor agreement.  Further, Silver Wheaton (Caymans) Ltd. ("<u>Silver Wheaton</u>") may assert an interest in the cash proceeds of the silver mined by the Debtors.  The Debtors will reserve such proceeds to the extent generated on a post-petition basis.

    c.      <u>Use of Cash Collateral</u>.  The Debtors seek authority to use Cash Collateral, wherever such Cash Collateral may be located, in accordance with the terms of the Interim Order to, among other things, (a) satisfy post-petition operating expenses of the Debtors as more fully described in the Budget, (b) pay certain prepetition obligations of the Debtors as authorized by the Court, and (c) pay reorganization expenses, including but not limited to allowed fees and expenses

---

[3] The summary of the Interim Order and the terms and conditions for the use of Cash Collateral set forth in this Motion is intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summary is qualified in its entirety by the Interim Order.  In the event there is any conflict between this Motion and the Interim Order, the Interim Order will control in all respects.

incurred by the professionals retained under sections 327, 328, 363, and/or 1102 of the Bankruptcy Code by the Debtors and any statutory committees appointed in the Debtors' chapter 11 cases (the "Chapter 11 Cases") pursuant to section 1102 of the Bankruptcy Code (each, a "Committee").

d.  Termination Date. (Interim Order ¶ 13).  The Debtors' ability to use Cash Collateral pursuant to the Interim Order shall end within forty-five (45) days following the Petition Date unless the Final Order has been entered.  Thereafter, it is expected that the Debtors will have access to Cash Collateral through the end of December 2014 in order to complete a sale process.

e.  Adequate Protection. (Interim Order ¶ 10(a)-(b) and ¶ 11).  To the extent of any Diminution in Value, the Debtors propose to provide adequate protection to the Administrative Agent and the Finance Parties as follows, subject to the Carve Out (as defined below): (i) a security interest in and lien on all unencumbered assets of Mineral Park and Mineral Park Holdings, a junior priority lien on all encumbered assets of such Debtors (the "Adequate Protection Lien"), *provided however*, that  pending entry of the Final Order, such security interest and lien shall not attach to any claims, defenses, causes of action or rights arising under sections 542-553 of the Bankruptcy Code or applicable state fraudulent transfer law (including all proceeds thereof, the "Avoidance Actions"), and (ii) to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative claim in the Chapter 11 Cases (the "Superpriority Claim"), *provided however*, that pending entry of the Final Order, such claim shall not extend to any Avoidance Actions.  As additional adequate protection, Mineral Park shall pay the reasonable fees and expenses of the Administrative Agent.

f.  Automatic Perfection. (Interim Order ¶ 16).  The Adequate Protection Lien shall be valid, binding, enforceable, non-avoidable and automatically perfected, notwithstanding the automatic stay, without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which otherwise may be required under the laws of any jurisdiction to validate or perfect such security interests and liens.

g.  Carve Out. (Interim Order ¶ 10(c)).  The Adequate Protection Lien and Superpriority Claim shall be subordinate to a carve out (the "Carve Out") which shall be comprised of the following:  (i)  all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (ii) fees and expenses up to $25,000 incurred by a trustee appointed under chapter 7 of the Bankruptcy Code; (iii) subject to a Committee Monthly Cap to

be agreed upon and budgeted amounts as to the Debtors' professionals, all allowed fees and expenses incurred by the professionals retained under sections 327, 328, 363, and/or 1102 of the Bankruptcy Code by the Debtors and any Committee through a termination event; and (iv) up to $500,000 incurred by such professionals following the termination date.

## DISCLOSURES

4.       Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or to obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion of such provisions.  Set forth below are the disclosures required in accordance with such rules:

a.       Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing.  **The proposed Interim Order and Final Order will not provide for cross-collateralization protection except through the grant of adequate protection liens to the extent of any diminution in the Finance Parties' interests in the Debtors' assets.**

b.       Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters.  **The proposed Interim Order and Final Order will contain stipulations by the Debtors relating to the validity, perfection, enforceability and amount of the Finance Parties' prepetition liens and claims.  However, such stipulations are subject to challenge by parties in interest within the time frames provided by Local Rule.**

c.       Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code.  **The proposed Interim Order will provide for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code, <u>subject to</u>**

**entry of the Final Order.  Hence, adequate notice will be provided before any surcharge waiver goes into effect.**

d.      Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.  **The proposed Interim Order will not contain any provisions that immediately grant liens on the Debtors' claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.  Any such liens are subject to entry of the Final Order.**

e.      Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code).  **The proposed Interim Order and Final Order will not contain provisions that deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code).**

f.      Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.  **The proposed Interim Order and Final Order will provide for disparate treatment for the professionals retained by a Committee only in that Committee professionals will be subject to a monthly cap to be agreed upon.**

g.      Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder.  **The proposed Interim Order and Final Order will not provide for the priming of any secured lien without the consent of that lienholder.**

h.      Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case.  **The proposed Interim Order and Final Order, at ¶10-11, will describe the forms of adequate protection provided to the Administrative Agent and the Finance Parties.**

i.      Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay.  **The proposed Interim Order and Final Order, at ¶ 14, will describe the**

**modification of the automatic stay to the extent necessary to implement the Interim Order.**

j.    Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate. **The proposed Interim Order and Final Order, at ¶ 16, will include provisions that provide for the automatic perfection and validity of the Adequate Protection Lien without the necessity of any further filing or recording under the laws of any jurisdiction.**

## BACKGROUND

5.    On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their business and manage their properties as debtors in possession. No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

6.    The factual background relating to the commencement of the Chapter 11 Cases is set forth in detail in the First Day Declaration and incorporated herein by reference.

## PREPETITION CAPITAL STRUCTURE

7.    In April 2010, Mineral Park entered into the Credit Agreement with the Administrative Agent and the Lenders to provide credit facilities totaling $130.0 million comprised of a $100.0 million non-revolving credit facility loan and a $30.0 million revolving credit facility loan. The proceeds of the Credit Agreement were used: (a) to retire pre-existing obligations under certain secured notes (substantially reducing the interest burden relating thereto), (b) for general working capital requirements and other general corporate purposes of Mineral Park, and (c) to pay fees and expenses related to the Credit Agreement.

8.      Mineral Park was also party to the following four hedging arrangements with the individual Lenders:  (a) that certain *ISDA Master Agreement* with Société Générale ("SG"), dated as of April 26, 2010, and related confirmations (as amended, the "SG Risk Management Agreements"), (b) that certain *ISDA Master Agreement* with Portigon AG, New York Branch (formerly WestLB AG, New York Branch) ("Portigon"), dated as of April 26, 2010, and related confirmations (as amended, the "Portigon Risk Management Agreements"), (c) that certain *ISDA Master Agreement* with Barclays Bank PLC ("Barclays"), dated as of April 26, 2010, and related confirmations (as amended, the "Barclays Risk Management Agreements"), and (d) that certain *ISDA Master Agreement* with Credit Suisse International ("CS"), dated as of April 26, 2010, and related confirmations (as amended, the "CS Risk Management Agreements," together with the SG Risk Management Agreements, the Portigon Risk Management Agreements and the Barclays Risk Management Agreements, the "Risk Management Agreements") (CS, SG, Portigon and Barclays are hereinafter collectively referred to as the "Qualified Risk Management Lenders," and together with the Administrative Agent and the Lenders are hereinafter collectively referred to as the "Finance Parties").  Mineral Park's obligations under the Risk Management Agreements also constitute obligations under the Credit Agreement and are secured by the same assets as the obligations under the Credit Agreement.  Each of the Risk Management Agreements has been terminated.

9.      On October 23, 2012, Mineral Park and the Lenders amended the Credit Agreement to, among other things, consolidate the existing loans into a single $91.7 million term loan and to establish: (i) a debt service reserve account; and (ii) a maintenance reserve account.

As of the Petition Date, there are minimal balances in such reserve accounts. In addition, Mineral Park has a proceeds account (the "Proceeds Account") that contains all proceeds of the company's sales of copper, molybdenum and silver. The Proceeds Account is held in the name of Mineral Park and held on deposit with the Administrative Agent. By the Cash Collateral Motion, Mineral Park proposes to access the Proceeds Account to fund its postpetition operational and administrative expenses consistent with the Budget.

10.    All of the obligations owing to the Lenders under the Credit Agreement are secured by liens (the "Prepetition Liens") on substantially all of Mineral Park's assets (the "Prepetition Collateral"), including cash collateral as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"). The Prepetition Liens are subject to certain "Permitted Liens" as defined in the Credit Agreement, including liens arising from the Intercompany Note (as defined below).

11.    As of the Petition Date, Mineral Park's obligations under the Credit Agreement totaled $86,786,667 in principal, plus accrued interest and fees, plus $16,183,108 outstanding to the Qualified Risk Lenders under the Risk Management Agreements. Debtor Mineral Park Holdings has guaranteed Mineral Park's obligations under the Credit Agreement and pledged the stock of Mineral Park to secure such obligations. Mercator Minerals Ltd. ("MML"), the ultimate parent of Mineral Park, has also guaranteed the obligations under the Credit Agreement, in part.

12.    In 2008, Mineral Park entered into an agreement (the "MPI Silver Purchase Agreement") with Mercator Minerals (Barbados), Ltd. ("MMBL"), a wholly-owned non-debtor subsidiary of MML. Pursuant to the MPI Silver Purchase Agreement, Mineral Park agreed to

sell to MMBL, and MMBL agreed to purchase from Mineral Park, an amount of silver equal to

one hundred percent (100%) of the number of ounces of silver mined, produced, extracted or

otherwise recovered from Mineral Park's mining properties for so long as silver is mined,

produced, extracted or otherwise recovered therefrom.

13.     Pursuant to a separate silver purchase agreement (the "Silver Wheaton Purchase

Agreement") between MMBL, MML and Silver Wheaton, MMBL agreed to sell its purchased

silver to Silver Wheaton.  Under the Silver Wheaton Purchase Agreement, Silver Wheaton made

an up-front payment of $42 million in cash to MMBL.  MML guaranteed the repayment

obligations of MMBL under the agreement, subordinate to certain claims.  MMBL loaned $40

million in cash to MML which in turn loaned $40 million in cash to Mineral Park, and Mineral

Park issued a promissory note in favor of MML in the amount of $40 million (the "Intercompany

Note").  The Intercompany Note was secured by a deed of trust against the silver in Mineral

Park's mining properties in favor of MML.  In turn, MML assigned its interests in the note and

associated deed of trust to Silver Wheaton (the "Silver Wheaton Lien").  As of the Petition Date,

the face amount outstanding under the Intercompany Note held by Silver Wheaton is $50

million.  Mineral Park reserves all rights to dispute the Silver Wheaton Lien and whether any

amounts remain owed under the Intercompany Note.  Pending the resolution of such dispute,

Mineral Park will reserve all cash proceeds generated from the sale of silver on a post-petition

basis.

14.     On December 12, 2013, MML announced that it had entered into an arrangement

agreement with Intergeo MMC Ltd ("Intergeo") and ancillary documentation to effect a business

combination through a plan of arrangement under Canadian law. In connection with this transaction, Daselina, Intergeo's controlling shareholder, agreed to advance up to $14 million to Mineral Park by way of a bridge loan to provide the company with sufficient funding to stabilize its operations until the transaction could be consummated. On August 1, 2014, MML announced that the completion deadline for the agreement had not been extended and therefore the arrangement agreement with Intergeo had terminated in accordance with its terms. As of the Petition Date, Mineral Park's principal obligations to Daselina total $13.0 million. Daselina's claims are secured by liens on substantially all of the Debtors' assets, junior to the liens and claims of the Administrative Agent, the Lenders, and Silver Wheaton.

15.    As of the Petition Date, Mineral Park's general unsecured debt, consisting primarily of trade debt, totals approximately $11.5 million.

### NEED FOR THE CONTINUED USE OF CASH COLLATERAL

16.    As more fully set forth in the First Day Declaration, the Debtors have an urgent and immediate need for the use of Cash Collateral, including cash currently held in the Proceeds Account. The Debtors have not obtained post-petition financing and, without the use of Cash Collateral, the Debtors will not be able to continue operations or to effectuate an orderly sale process that will maximize value for creditors.

17.    Mineral Park is an operating entity that employs approximately 415 people. Mineral Park is the second largest employer in Mohave County, Arizona, second only to the County itself. Mineral Park currently has two twelve-hour shifts working in ongoing mining operations in Mineral Park, Arizona.

18.     Debtor Bluefish Energy Corporation ("Bluefish") operates an on-site power facility that provides power to the mine.  Bluefish and is not covered by this Motion and does not intend to directly utilize cash collateral on a post-petition basis except as authorized by separate order of this Court; however Mineral Park intends to make payments from cash collateral to, or for the benefit of, Bluefish for power supplied on a post-petition basis to Mineral Park by Bluefish pursuant to that certain Power Purchase Agreement, dated as of December 15, 2010, between Bluefish, as the seller, and Mineral Park, as the purchaser.

19.     Without immediate access to Cash Collateral, the Debtors would be forced to immediately cease mining operations and terminate all employees, causing immediate and irreparable harm to these estates.  In order to preserve and maximize going concern value, the Debtors urge the Court to approve this Motion.

20.     The Debtors are informed that the Administrative Agent will consent to entry of the Interim Order.  Daselina is not entitled to adequate protection pursuant to its intercreditor agreement with the Administrative Agent.  Silver Wheaton is adequately protected by the Debtors' agreement to reserve the postpetition proceeds of silver sales.  Further, the secured parties will be adequately protected by the Debtors' proposed use of cash collateral in at least three ways:  (1) the going concern value of the Debtors' business will be preserved, at least for a time; (2) the Debtors are projected to be breakeven or better on a cash flow basis based on various reasonable assumptions relative to commodity pricing, equipment availability and other key operating parameters; and (3) the Debtors are proposing to provide further adequate protection in the form of an Adequate Protection Lien as set forth herein and in the proposed

Interim Order to cover any possible Diminution in Value of the Finance Parties' collateral from

the Debtors' proposed use of Cash Collateral in accordance with the Budget.

## APPLICABLE AUTHORITY

21.    Section 361 of the Bankruptcy Code provides, in pertinent part, as follows:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by –
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property; . . .
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

22.    Section 362 of the Bankruptcy Code provides, in pertinent part, as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . .
>
> (1) for cause . . . .

11 U.S.C. § 362.

23.    Section 363 of the Bankruptcy Code provides, in pertinent part, as follows:

(a) In this section "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use of occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 522(b) of this title, whether existing before or after the commencement of a case under this title.

*          *          *

(c)(1) If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

(A)  each entity that has an interest in such cash collateral consents; or

(B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(3) Any hearing under paragraph (2)(B) of this section may be a preliminary hearing . . . but shall be scheduled in accordance with the needs of the debtor.  If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section.  The court shall act promptly on a request for authorization under paragraph (2)(B) of this subsection.

*          *          *

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or

condition such use, sale, or lease as is necessary to provide
adequate protection of such interest.

11 U.S.C. § 363.

24.    Section 507 of the Bankruptcy Code provides, in pertinent part, as follows:

(b) If the trustee, under section 362, 363, or 364 of this title,
provides adequate protection of the interest of a holder of a claim
secured by a lien on property of the debtor and if, notwithstanding
such protection, such creditor has a claim allowable under
subsection (a)(2) of this section arising from the stay of action
against such property under section 362 of this title, from the use,
sale, or lease of such property under section 363 of this title, or
from the granting of a lien under section 364(d) of this title, then
such creditor's claim under such subsection shall have priority
over every other claim allowable under such subsection.

11 U.S.C. §507.

25.    Rule 4001 of the Bankruptcy Code provides, in pertinent part, as follows:

(d) *Agreement relating to . . . use of cash collateral . . .*

(1) *Motion; Service.*

(A) A motion for approval of any of the following shall be
accompanied by a copy of the agreement and a proposed form of
order: . . . (iv) an agreement to use cash collateral;

(B) *Contents.*

The motion shall consist of or (if the motion is more than five
pages in length) begin with a concise statement of the relief
requested, not to exceed five pages, that lists or summarizes, and
sets out the location within the relevant documents of, all material
provisions of the agreement. In addition, the concise statement
shall briefly list or summarize, and identify the specific location of,
each provision in the proposed form of order, agreement, or other
document of the type listed in subdivision (c)(1)(B). The motion
shall also describe the nature and extent of each such provision..

(C) *Service.*

The motion shall be served on: (1) any committee elected under §
705 or appointed under§ 1102 of the Code, or its authorized agent,

or, if the case is a chapter 9 municipality case or a chapter 11 reorganization case and no committee of unsecured creditors has been appointed under § 1102, on the creditors included on the list filed under Rule 1007(d); and (2) on any other entity the court directs.

(2) *Disposition*; *Hearing*. If no objection is filed, the court may enter an order approving or disapproving the agreement without conducting a hearing. If an objection is filed or if the court determines a hearing is appropriate, the court shall hold a hearing on no less than seven days' notice to the objector, the movant, the parties on whom service is required by paragraph (1) of this subdivision and such other entities as the court may direct.

FED. R. BANKR. P. 4001.

26.    Section 105(a) of the Bankruptcy Code provides, in relevant part, as follows:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

11 U.S.C. § 105(a).

## BASIS FOR RELIEF

27.    Without immediate access to Cash Collateral, the repercussions to the Debtors' business will be catastrophic and likely irreparable, ending its ability to function as a viable going concern.  The Debtors need to fund, among other things, payroll for their approximately 415 current employees, continued uninterrupted purchases from vendors, deliveries of product to customers, and otherwise fulfill their obligations and pay their debts in the ordinary course of business.

28.    In sum, if the Motion is not approved, the Debtors' only alternative would be a piecemeal liquidation, as they would be unable to sustain their operations or preserve the value of their estates during the pendency of the Chapter 11 Cases.  In this regard, the relief sought in this Motion should be granted.

## THE DEBTORS MUST BE ALLOWED TO USE CASH COLLATERAL

**A.    The Debtors Have an Immediate Need to Use Cash Collateral**

29.    Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990). After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

30.    As previously noted, in order to address their working capital needs and fund other costs and expenses associated with their reorganization efforts, the Debtors require access to Cash Collateral. The use of Cash Collateral will provide the Debtors with the necessary capital with which to operate their business, including funding the Debtors' obligations to employees, and to successfully reorganize under chapter 11. The Debtors generate cash through their ongoing operations, plus additional funds are available to Mineral Park through the Proceeds Account.

31.    Cash is necessary for working capital and capital expenditures, and operating costs and expenses incurred during these cases. The Debtors do not have any available sources of working capital or financing to carry on the operation of their business without the use of Cash

Collateral.  The Debtors' ability to maintain their business is dependent on their ability to

continue to operate, and the Debtors cannot operate unless they can fund payments for

postpetition goods, services and other operating expenses.  Use of the Cash Collateral thus is

essential to the Debtors' continued viability and the value of their business as a going concern

and will provide the Debtors with the opportunity for a successful reorganization.

32.     Further, the alternative in these cases is "to force the debtors to close down their

operations and thus doom any effort at reorganization which will hopefully extract the maximum

value of the assets involved to the benefit of *all* classes of creditors and other constituencies

involved in this case."  *In re Dynaco Corp.,* 162 B.R. 389, 396 (Bankr. D.N.H. 1993).  Because

this result would be at fundamental odds to the rehabilitative purposes of chapter 11, approval of

the Motion is warranted.  *Id.* at 394 (noting that "it is apparent that the Congress intended

business under reorganization to proceed in as normal a fashion as possible") (*quoting In re

Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

**B.**     **Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral**

33.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession

may not use cash collateral unless (i) each entity that has an interest in such cash collateral

provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing.

*See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in

possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e).

34.     Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under section 361.  However, the statute plainly provides that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."  11 U.S.C. §§ 361, 363(e); *see also General Elec. Mortgage Corp. v.  South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 989-90 & n.4 (Bankr. D. Utah 1982).

35.     The phrase "value of such entity's interest," although not defined in the Bankruptcy Code, was addressed by the Supreme Court in the landmark *Timbers* decision, *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs, Ltd.*, 484 U.S. 365, 108 S.Ct. 626 (1988).  For the meaning of "value of such entity's interest," the Supreme Court was guided by section 506(a), which defines a creditor's allowed secured claim:

> The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.'  H.R. Rep. No. 950-595, pp. 181, 356 (1977); *see also* S. Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312.  <u>We think the phrase 'value of such entity's interest' in § 361(1) and (2), when applied to secured creditors, means the same.</u>

*Id.* at 630 (emphasis added).

36.     *Timbers* teaches that a secured creditor is entitled to "adequate protection" only against diminution in the value of the collateral securing the creditor's allowed secured claim. Under *Timbers*, therefore, where the "value of the collateral" is not diminishing by its use, sale,

or lease, the creditor's interest is adequately protected.  This conclusion flows directly from the equivalency of "value of such entity's interests" with "value of the collateral."

37.    Here, <u>the Debtors are informed that the Administrative Agent will consent to entry of the Interim Order</u>.   Daselina is not entitled to adequate protection pursuant to its intercreditor agreement with the Administrative Agent.  Silver Wheaton is adequately protected by the Debtors' agreement to reserve the postpetition proceeds of silver sales.  Further, the interests of the secured parties are adequately protected for the following three reasons.

38.    First, the Debtors require immediate access to cash collateral in order to remain operational.  The Debtors' assets are worth more as a going concern.  An operating mine that has knowledgeable and experienced employees in place and is generating ongoing revenues is significantly more valuable than an idle mine.

39.    Second, as reflected in the Budget, the Debtors are projected to be breakeven or better on a cash flow basis based on various reasonable assumptions relative to commodity pricing, equipment availability and other key operating parameters.  Hence, there should be no substantial diminution in the value of any Cash Collateral.

40.    Third, notwithstanding that the Administrative Agent and the Finance Parties are adequately protected for the reasons noted above, the Debtors have proposed further adequate protection in the form of an Adequate Protection Lien.  Section 361 of the Bankruptcy Code authorizes a debtor to provide adequate protection by granting replacement liens, making periodic cash payments, or granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."  *See* 11 U.S.C. §

361.  The proposed Interim Order also contemplates the reimbursement of expenses of the Administrative Agent.

41.    The Debtors believe that the proposed adequate protection components described above are fair and reasonable and compensate the Administrative Agent and the Finance Parties for any possible Diminution in Value of the Debtors' assets.  Given the significant value that the Debtors stand to lose in the event they are denied access to continued use of Cash Collateral, such protections are wholly appropriate and justified.

## INTERIM ORDER AND FINAL HEARING

42.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the initial hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

43.    The urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors are authorized to use the Cash Collateral as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Chapter 11 Cases.  Without the ability to use Cash Collateral, the Debtors would be unable to meet their postpetition obligations and would be unable to fund their working capital needs, thus causing irreparable harm to the value of the Debtors' estates and ending the Debtors' reorganization efforts.  Accordingly, the Debtors respectfully request that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after

the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the

Final Order be implemented and be deemed binding.

## NOTICE OF MOTION

44.    Notice of this Motion will be provided to:  (a) the Office of the United States

Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against

the Debtors (on a consolidated basis); (c) the Administrative Agent; (d) counsel for the

Administrative Agent; (e) Daselina Investments Ltd., (f) Trafigura AG (Bluefish lender), (g)

Fifth Third Bank (Bluefish lender), (h) Silver Wheaton (Caymans) Ltd., (i) the United States

Environmental Protection Agency; (j) the United States Attorney's Office for the District of

Delaware; (k) the Internal Revenue Service; (l) the cash management banks with whom the

Debtors maintain their bank accounts; and (m) all parties who are known, after reasonable

inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral, by telecopy,

email, overnight courier and/or hand delivery.  Because of the nature of the relief requested, the

Debtors respectfully submit that no other or further notice of the relief requested in this Motion

need be given.

## NOTICE WITH RESPECT TO FINAL HEARING

45.    No trustee, examiner or statutory committee has been appointed in the Debtors'

cases.  Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be

authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with

the Interim Order, by hand or overnight mail or courier service (or for those set up to receive

electronic transmissions, by electronic transmission), upon:  (a) the Office of the United States

Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the Administrative Agent; (d) counsel for the Administrative Agent; (e) Daselina Investments Ltd., (f) Trafigura AG, (g) Fifth Third Bank, (h) Silver Wheaton (Caymans) Ltd., (i) the United States Environmental Protection Agency; (j) the United States Attorney's Office for the District of Delaware; (k) the Internal Revenue Service; (l) the cash management banks with whom the Debtors maintain their bank accounts; (m) all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully request that such notice is sufficient and request that this Court find that no further notice of the Final Hearing and Final Order is required.

## <u>NO PRIOR REQUEST</u>

46.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, based upon the foregoing, the Debtors request entry of the Interim

Order and the Final Order under sections 105, 361, 362, 363, and 507 of the Bankruptcy Code,

Bankruptcy Rule 4001 and Local Rule 4001-2, (i) authorizing the Debtors to (a) use Cash

Collateral and (b) provide adequate protection to the Administrative Agent and the Finance

Parties; and (ii) scheduling the final hearing.

Dated: August 25, 2014        PACHULSKI STANG ZIEHL & JONES LLP

_James E. O'Neill_
Jeremy V. Richards (CA Bar No. 102300)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302/652-4100
Facsimile:  302/652-4400
E-mail:      jrichards@pszjlaw.com
                 mlitvak@pszjlaw.com
                 joneill@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in
Possession