IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Mineral Park, Inc., et al.,[1] | ) | Case No.: 14-11996 (KJC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**[Requested] Hearing Date:**
**January 20, 2015 @ 10:00 A.M. Eastern**
**[Requested] Objection Deadline:**
**January 16, 2015 @ 4:00 P.M. Eastern**

**MOTION FOR AN ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS MINERAL PARK, INC. AND BLUEFISH ENERGY CORPORATION OUTSIDE THE ORDINARY COURSE OF BUSINESS, (B) AUTHORIZING THE SALE OF MINERAL PARK, INC.'S AND BLUEFISH ENERGY CORPORATION'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

Mineral Park, Inc. ("Mineral Park") and Bluefish Energy Corporation ("Bluefish"), two

of the debtors and debtors in possession (Mineral Park and Bluefish are together referenced

herein as the "Debtors") in the above-captioned proceeding, file this motion (this "Sale Motion")

for entry of an Order (i) approving the *Asset Purchase Agreement* dated January 7, 2015 (the

"Agreement", a copy of which, with exhibits or schedules, is attached hereto as **Exhibit A**)

between the Debtors, as sellers, and Origin Mining Company, LLC, as buyer (the "Buyer"),[2] and

---

[1]  The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Mineral Park, Inc. (6900); Bluefish Energy Corporation (6843); Mercator Mineral Park Holdings Ltd. (3520); and Lodestrike Resources Ltd. (7923).  The mailing address for Debtors Mineral Park, Inc. and Bluefish Energy Corporation is 8275 N. Mineral Park Road, Golden Valley AZ  86413.  The mailing address for Debtors Mercator Mineral Park Holdings Ltd. and Lodestrike Resources Ltd. is #1050 - 625 Howe Street, Vancouver BC V6C 2T6.

[2]  The Buyer is an affiliate of Waterton Global Resource Management Cayman Corp.

authorizing the sale of certain assets of Debtors Mineral Park and Bluefish outside the ordinary

course of business; (ii) authorizing the sale of Mineral Park's and Bluefish's assets free and clear

of all liens, claims, encumbrances and interests pursuant to sections 363(b), (f) and (m) of the

Bankruptcy Code; (iii) authorizing the assumption and assignment of certain executory contracts

and unexpired leases; and (iv) granting related relief.

In support of this Sale Motion, the Debtors respectfully state as follows:

**Preliminary Statement**

1.      Beginning December 29, 2014, the Debtors commenced the process of

transitioning their mining and milling operations into "care and maintenance" status ("C&M

Status").  C&M Status means that the Debtors' operations will no longer produce copper,

molybdenum, and silver products, but the Debtors' assets will be maintained in a manner that

will allow such operations to be quickly and efficiently restarted at a later date if doing so

becomes economically viable.  While the mining and milling operations are being placed into

C&M Status, the Debtors have a copper leaching operation that is expected to continue

generating revenues for some time.  Due to the Debtors' financial situation (as described below),

with the transition to C&M Status, the bulk of the Debtors' work force was let go.  The Debtors

have retained a small contingent of security and administrative staff to satisfy environmental and

regulatory requirements and to continue to sell the copper cathode produced from their leaching

operations.

2.      The Debtors were required to take the drastic step of moving to C&M

Status by a combination of various factors, including (a) the lack of a viable going concern bid

2

for the Debtors' assets, despite an extensive marketing effort, (b) substantial adverse market fluctuations in copper, molybdenum and silver prices that resulted in negative cash flow from the Debtors' operations and an irreversible liquidity crunch, (c) the lingering effects of the long-term shortage of capital for reinvestment in the maintenance and optimization of operations, and (d) the understandable reticence on the part of Mineral Park's principal secured lenders to allow any further diminution in the value of their collateral.  Based on each of the foregoing factors and having exhausted all other alternatives for raising funding or effectuating a sale or other exit strategy, the Debtors were left with no choice but to curtail mining and milling operations in the manner described above.  As of the date of this Sale Motion, the Debtors expect to have authority to continue to utilize cash collateral for the limited purpose of funding the transition to C&M Status and selling copper cathode produced from the leaching operations only through January 23, 2015, which is also the outside date for closing the sale contemplated by the Agreement.[3]

3.        Under the Agreement, the Debtors propose to sell, in C&M Status, Mineral Park's mine and certain associated equipment, including Bluefish's electricity generator, to the Buyer for $10,000,000.  The sale also will include the assumption of specifically identified liabilities, including environmental reclamation obligations, which will have the effect of the Buyer reimbursing the Debtors for approximately $3,500,000 of pledged cash collateral.  The

---

[3]  As of the date of this Sale Motion, the Debtors only have authority to use cash through January 16, 2015.  The Debtors have requested an extension of the cash collateral budget through January 23, 2015, but have not yet obtained such extension from their lenders.

Buyer is not acquiring any of the Debtors' cash, finished goods inventory, accounts receivable, certain prepaid assets, or litigation claims.[4]

4.      As outlined in further detail below, the Debtors are out of options. The only other alternative to the proposed sale is abandonment of the mine. The Debtors, with the assistance of their investment banker, have conducted a robust marketing effort over the last four months. This intensive four-month process trailed directly on the heels of a separate sales process that sought to sell the Debtors' assets along with those of its parent company. Although initial indications of interest from prospective buyers in the latest sales process were positive, no acceptable going concern bids for the Debtors' assets have been received. The Debtors therefore have determined, in the sound exercise of their business judgment, that the C&M Status sale proposal from the Buyer represents the highest and best offer for the Debtors' assets. The Debtors will have completed their transition to a C&M Status by January 23, 2015, which is also the date through which the Debtors expect to have cash collateral authority. Therefore, the Debtors request that the Court approve the Agreement on an expedited basis on or before **January 22, 2015**.

## **Jurisdiction**

5.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O). Venue of these proceedings and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4]  The Debtors received two non-binding expressions of interest that contemplated a going concern sale, neither of which was free of contingencies or constituted a higher or better bid than the Buyer's proposed bid.

6.        The statutory predicates for the relief sought herein are sections 105, 363, 365, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Compliance With Local Rule 6004-1**

7.        The following disclosures are based, to the best of the Debtors' knowledge, on the current state of affairs with respect to the proposed sale described further below.  To the extent of any material changes, the Debtors will make further disclosures to the Court at or prior to the sale hearing.

8.        *A copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale:*  A copy of the Agreement is attached hereto as **Exhibit A**.

9.        *A copy of the proposed form of sale order:*  A copy of the proposed form of sale order is attached hereto as **Exhibit B**.

10.        *A request, if necessary, for the appointment of a consumer privacy ombudsman under Bankruptcy Code section 332:*  The Debtors do not have any consumer privacy information and thus it is not necessary to seek the appointment of a consumer privacy ombudsman in connection with the sale.

11.        Provisions to be Highlighted:

(i) *Sale to an Insider*:  The Buyer is not an insider (as defined in section 101(31) of the Bankruptcy Code) of the Debtors.

(ii) *Agreements with Management*:  The Debtors are not aware of any agreements between the Buyer and management or any key employees at this time.  However, as part of transitioning into its anticipated ownership role, the Buyer may hire certain of the Debtors' current or former employees or management following the closing of the proposed sale.

(iii) *Releases*:  The Buyer will have no obligations arising as part of the sale except as set forth in the Agreement.  The Debtors will be released of any further obligations arising under any assumed executory contracts or unexpired leases and certain assumed obligations as set forth in the Agreement.

(iv) *Private Sale/No Competitive Bidding*:  The proposed sale to Buyer is a private sale.  No auction is to occur with respect to the Sale.  However, in the event that the Agreement is approved by the Court, but the Debtors proceed to consummate an alternative sale transaction with another party, the Buyer will be entitled, solely out of the proceeds of such alternative transaction, to a termination fee of $300,000, plus the reimbursement of its reasonable expenses in an amount not to exceed $200,000.  Further, the Agreement provides the Buyer with a right of first refusal with respect to any alternative transaction proposal received by the Debtors.

(v) *Closing and Other Deadlines*:  The earlier of (i) the second (2nd) business day following the satisfaction of the last of the conditions set forth in Sections 4.1 and 4.2 of the Agreement and (ii) January 23, 2015.

DOCS_SF:86814.5 57302-002

(vi)  *Good Faith Deposit*:  In an amount equal to $1,000,000.

(vii)  *Interim Arrangements with Proposed Buyer*:  There are no provisions for operation or management of the Debtors by any Buyer prior to closing.

(viii)  *Use of Proceeds*:  All sale proceeds are to be retained by the Debtors' estates pending further order of this Court.  The Debtors reserve any and all rights to seek surcharge against any putative lienholders pursuant to section 506(c) of the Bankruptcy Code, provided that the Debtors acknowledge that they waived any right to surcharge the collateral of the Lenders (as defined below) pursuant to Section 11(j) of the Final Cash Collateral Order.

(ix)  *Tax Exemption*:  No tax exemption is sought beyond the requisites of bankruptcy law.

(x)  *Record Retention*:  For an agreed period pursuant to the Agreement, the Debtors shall have reasonable access to all of the books and records relating to the Assets sold to the Buyer.

(xi)  *Sale of Avoidance Actions*:  No sale of avoidance actions is currently contemplated by the Sale.

(xii)  *Requested Findings as to Successor Liability*:  The transaction documents contemplate that, except as to Assumed Liabilities (as defined in the Agreement), the Buyer will purchase the Assets free and clear of all pre-closing liabilities under successor liability theories.  *See also* Sale Order ¶ 32.

(xiii) *Sale Free and Clear of Unexpired Leases*:  The sale is to be free and clear of all liens and unassumed liabilities.  Sale Order ¶ 13.

(xiv) *Credit Bid*:  Although the Final Cash Collateral Order permits the Agent (as defined below) to credit bid up to the full amount of the Secured Obligations (as defined in the Final Cash Collateral Order), the Agent has informed the Debtors that it has no intention to submit a credit bid for the Assets.

(xv) *Relief From Bankruptcy Rule 6004(h)*:  The proposed Sale Order provides that, notwithstanding Bankruptcy Rules 6004, 6006 and 7062, the Sale Order shall be effective and enforceable immediately upon entry.  Sale Order ¶ 41.  The Debtors believe that relief from Bankruptcy Rule 6004(h) is appropriate to enable the proposed transaction to close on or before January 23, 2015.  As set forth in this Sale Motion, the Debtors are ensuring that all parties in interest will receive adequate notice and opportunity to object prior to the sale hearing.

**Background**

12.     On August 25, 2014 (the "Petition Date"), the Debtors commenced their respective cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

13.     The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 27, 2014, the Court entered an order jointly administering each of the above-captioned cases.

14.     On September 9, 2014, the Office of the United States Trustee appointed a committee of unsecured creditors (the "Creditors' Committee").  The Creditors' Committee has been fully updated as to the status of the Debtors' sale efforts throughout this case by way of, among other things, weekly conference calls with the Debtors' investment banker and financial advisors.

15.     The factual background relating to the commencement of these chapter 11 cases is set forth in detail in the *Declaration of Marc S. LeBlanc in Support of First Day Motions* (the "LeBlanc Declaration") filed on the Petition Date.

**Debtors' Business Background and the Assets to Be Sold**

16.     The Debtors are wholly owned indirect subsidiaries of Mercator Minerals Ltd. ("MML"), a mineral resource company that was engaged through various subsidiaries in the mining, exploration, development and operation of its mineral properties in Mohave County, Arizona, and Sonora, Mexico.[5]  Co-debtors Lodestrike Resources Ltd. ("Lodestrike") and Mercator Mineral Park Holdings Ltd. ("Mercator") are the immediate parent holding companies of Mineral Park and Bluefish, respectively.  For the avoidance of doubt, Lodestrike and Mercator are not moving parties for purposes of the relief sought in the Motion.

17.     Prior to the Petition Date, as part of a comprehensive restructuring effort by MML, the Debtors' equity interests were marketed and were to be conveyed to an acquirer as part of a global transaction that fell apart during Summer 2014.

---

[5]  MML is currently the subject of insolvency proceedings in Canada.

DOCS_SF:86814.5 57302-002

18.      Mineral Park owns and operates a producing copper-molybdenum mine encompassing approximately 6,497 acres of contiguous ground located near Kingman, Arizona (the "Mineral Park Mine").  The Mineral Park Mine is an open pit mine operation that, until recently, utilized drilling, blasting, shovel loading and truck hauling to excavate rock. Mineral Park then utilized certain processes to extract minerals from the rock at the Mineral Park Mine, which were then processed into copper, molybdenum, and silver concentrates for commercial sale.

19.      Beginning December 29, 2014, the Debtors commenced the process of transitioning their mining and milling operations into C&M Status, which means that the Debtors are no longer producing copper, molybdenum, and silver products.  However, the Debtors' assets will be maintained in a manner that will allow such operations to be quickly and efficiently restarted at a later date if doing so becomes economically viable.  While the mining and milling operations are being placed into C&M Status, the Debtors have a copper leaching operation that is expected to continue generating revenues for some time.  Due to the Debtors' financial situation, with the transition to C&M Status, the bulk of the Debtors' work force was let go.  The Debtors have retained a small contingent of security and administrative staff to satisfy environmental and regulatory requirements and to continue to sell  the copper cathode produced from their leaching operations.

20.      Bluefish's operations consist of the ownership and, until recently, operation of an industrial gas turbine power generator (the "Bluefish Turbine"), which Bluefish purchased in August 2010.  The Bluefish Turbine is housed at a facility located at the Mineral

10

Park Mine, and the power generated at the Bluefish facility, until recently, was utilized

exclusively to supply the Mineral Park Mine.

**The Debtors' Sale Efforts and Transition to C&M Status**

21.        As discussed in more detail below, in order to maximize the value of

the Assets for the benefit of all constituents, the Debtors actively marketed the mining operations

and other business assets associated with the Mineral Park Mine, together with the Bluefish

Turbine and any associated property with the intention to find a buyer that would purchase the

assets and maintain operations on a going concern basis.  Although the Debtors received initial

indications of interests in their assets from potential purchasers that were promising, no viable

offers to purchase the assets as a going concern have materialized.[6]

22.        The lack of viable offers was likely impacted by recent dramatic

negative fluctuations in the prices of copper and molybdenum, the Debtors' principal marketable

commodities.  As an example, copper, molybdenum and silver were trading at $3.22 per pound,

$13.15 per pound and $19.49 per ounce, respectively, as of the Petition Date.  In the four months

since, the price of copper, molybdenum and silver have fallen to $2.86 per pound, $9.53 per

pound and $15.71 per ounce, respectively, corresponding to declines of 11%, 28% and 19%,

respectively.  These price reductions have had a catastrophic effect on the Debtors' cash flows

and liquidity.  Although the Debtors were generating positive operating cash flow as of the

Petition Date, the Debtors are currently operating at a negative operating margin given the

current commodity price environment.

---

[6]  As noted above, the Debtors received two non-binding expressions of interest that contemplated a going concern
sale, neither of which was free of contingencies or constituted a higher or better bid than the Buyer's proposed bid..

23.     In this context and based on the Debtors' inability to provide the
Mineral Park Lenders with adequate protection for their interest in cash collateral, beginning
December 29, 2014, the Debtors commenced the process of transitioning their mining and
milling operations to C&M Status.  This transition should be completed by January 23, 2015.

24.     As noted above, the Debtors' decision to transition to C&M Status was
not taken lightly.  The Debtors and their lenders have exhausted all other options available to
them, including as described further below, an extensive four-month marketing process (that
followed an earlier exhaustive sales process).  Ultimately, the decision to cease operations was
precipitated by a number of factors including (a) the lack of a viable going concern bid, (b)
substantial adverse market fluctuations in copper, molybdenum and silver prices that resulted in
negative cash flow from the Debtors' operations and an irreversible liquidity crunch, (c) the
lingering effects of the long-term shortage of capital for reinvestment in the maintenance and
optimization of operations, and (d) the understandable reticence on the part of Mineral Park's
principal secured lenders to allow any further diminution in the value of their collateral.   Based
on each of the foregoing factors and having exhausted all other alternatives for raising funding or
effectuating a sale or other exit strategy, the Debtors were left with no choice but to curtail
mining and milling operations in the manner described above.  As of the date of this Sale
Motion, the Debtors have authority to continue to utilize cash collateral for the limited purpose
of transitioning to C&M Status.

25.     Under these circumstances, the proposed Agreement represents the
highest and best offer currently available to the Debtors.  The Debtors are further constrained by

the anticipated expiration of their cash collateral authority on January 23, 2015, when the

Debtors are expected to have completed their transition to C&M Status.[7]  From that point

forward, the Debtors must either convey the assets to the Buyer and realize on the consideration

contemplated by the Agreement, or abandon the Mineral Park Mine.  For this reason, the

Agreement contemplates an outside date for closing of January 23, 2015.

**Financing and Liens Affecting the Assets**

26.    Mineral Park and Bluefish are parties to certain credit facilities and

other financing arrangements that resulted in liens on the Assets:[8]

(a.)    Mineral Park is the borrower under a credit facility with Société

Genérale, for itself and in its capacity as administrative agent (the "Agent") for certain lenders

(collectively, the "Lenders"), and is a party to four terminated hedging arrangements with certain

individual Lenders.  The obligations under both the credit facility and hedging arrangements are

secured by liens on substantially all of Mineral Park's assets, including cash collateral.  The

Lenders are collectively owed over $100,000,000 by Mineral Park and Mercator (as guarantor).

(b.)    Mineral Park was a party to a silver purchase agreement with

Mercator Minerals (Barbados), Ltd. ("MMB"), a wholly-owned non-debtor subsidiary of MML

pursuant to which MMB purchased 100% of the silver mined from the Mineral Park Mine.  In

turn, MMB sold the purchased silver to Silver Wheaton (Caymans) Ltd. ("Silver Wheaton")

---

[7]  As of the date of this Sale Motion, the Debtors only have authority to use cash through January 16, 2015.  The Debtors have requested an extension of the cash collateral budget through January 23, 2015, but have not yet received such extension from their lenders.

[8]  The Debtors reserve any and all rights to seek surcharge against any putative lienholders pursuant to section 506(c) of the Bankruptcy Code, provided that the Debtors acknowledge that they waived any right to surcharge the collateral of the Lenders pursuant to Section 11(j) of the Final Cash Collateral Order.

DOCS_SF:86814.5 57302-002

pursuant to a separate silver purchase agreement.  Through various associated transactions, Silver Wheaton asserted a security interest in the silver in the ground at the Mineral Park Mine and the proceeds thereof.  On October 28, 2014, the Debtors, Silver Wheaton, and the Lenders reached an agreement to resolve Silver Wheaton's claims.  A motion to approve the settlement agreement was filed on October 28, 2014 [Docket No. 223] and approved by the Court by order entered on November 4, 2014 [Docket No. 238].  By virtue of the settlement, Silver Wheaton has no further liens or claims directly against the Debtors' assets, but does have the benefit of a priority administrative claim in the amount of $700,000.[9]

(c.)     In connection with an agreement between MML and Intergeo MMC Ltd. ("Intergeo") to effect a business combination through a plan of arrangement under Canadian law, Daselina Investments Ltd. ("Daselina"), Intergeo's controlling shareholder, agreed to advance up to $14.0 million to Mineral Park by way of a bridge loan.  Daselina's claims are secured by liens on substantially all of the Debtors' assets, junior to the liens and claims of the Agent, the Lenders, and Silver Wheaton.  As of the Petition Date, Daselina is owed approximately $13.0 million in principal obligations.

(d.)     To finance the purchase of the Bluefish Turbine, Bluefish entered into a *Master Loan and Security Agreement* with Trafigura AG ("Trafigura"), as lender, in the original principal amount of $20.8 million.  Further, in connection with such purchase, Bluefish entered into a Letter of Credit Agreement by and among Bluefish, Trafigura, and Fifth Third Bank.  Bluefish pledged substantially all of its assets in favor of Trafigura to secure the

---

[9]  The narrative in this Sale Motion is for descriptive purposes only.  If any discrepancy between this Sale Motion and the settlement exist, the terms of the settlement control.

14

obligations under the credit facility with Trafigura.  As of the Petition Date, Trafigura is owed

approximately $13.4 million in principal obligations.

27.     In addition to the foregoing financing liens, the Mineral Park Mine is the

subject of various tax liens under Arizona law for unpaid *ad valorem* taxes to Mohave County,

Arizona.  Although the amounts of such tax liens are disputed, Mohave County has asserted

secured claims against Mineral Park's assets totaling in excess of $15,000,000.

28.     Pursuant to the Final Cash Collateral Order entered by the Bankruptcy

Court on October 9, 2014, the Debtors were required to meet certain sale milestones, which were

subsequently modified with the consent of the Lenders.  As of the date of this Sale Motion, the

the Debtors do not expect to have cash collateral authority beyond January 23, 2015, the date by

which the Debtors should have completed the transition to C&M Status as well as being the

outside closing date for the proposed sale to the Buyer.

**The Sale Process**

29.     In order to maximize the value of the Debtors' assets for the benefit of all

constituents, the Debtors retained Evercore Group, L.L.C. ("Evercore"), *nunc pro tunc* to the

Petition Date, as their financial advisor to advise the Debtors on a sale, restructuring and/or

financing transaction, including the marketing and sale of the Assets.  Significant efforts were

undertaken by the Debtors and Evercore relating to the preparation of marketing materials and

other marketing efforts as part of the sale process.

30.     The Debtors, with Evercore's assistance, formally commenced that

process on September 10, 2014.  Marketing materials, including an executive summary

("Teaser") and a Confidential Informational Memorandum (the "CIM") were prepared, an online data site with diligence materials was created, and potential buyers were identified. Approximately one hundred-twenty (120) industry participants, comprised of fifty-four (54) strategic investors and sixty-six (66) financial investors, and other potential buyers were contacted by Evercore, with the approval and input of the Debtors' management.  Evercore distributed one hundred-twenty (120) Teasers.  Approximately twenty-four (24) parties returned executed confidentiality agreements and were provided with the CIM and access to the online data site.  The Debtors ultimately received five (5) non-binding expressions of interest on October 31, 2014, and one (1) non-binding expression of interest on November 6, 2014 and subsequently entered into detailed due diligence with five (5) of these six (6) parties.

31.    Each of the foregoing five parties was invited to conduct an in-person site visit of the Mineral Park Mine and to meet with the Debtors' management and their advisors. Four of the five parties submitting bids attended these site visits on separate occasions during the month of November, and all five parties were provided with a wealth of additional information about the Debtors and their assets.  Each of these five parties was also informed that binding bids, along with asset purchase agreements, would be due on December 15, 2014.  It was not until this date that the Debtors learned that no viable going concern bids were received.  The Buyer submitted a bid for a "care and maintenance" sale of the Mineral Park Mine and its associated assets.[10]

---

[10]  As noted above, the Debtors received two non-binding expressions of interest that contemplated a going concern sale, neither of which was free of contingencies or constituted a higher or better bid than the Buyer's proposed bid..

32.    At this point, given the lack of acceptable going concern bids and the continued dislocation in commodity prices, the Debtors began preparations for a conversion to C&M Status, which process formally commenced on December 29, 2014.  At the same time, the Debtors conducted negotiations with the Buyer on the terms of an acceptable Agreement to acquire the Mineral Park Mine and its related assets.  The Agreement was finalized on January 7, 2015 and contemplates a sale closing by no later than January 23, 2015.

33.    In light of the extensive marketing process conducted by the Debtors, the lack of any viable going concern bids that would yield additional consideration for the estates, and the liquidity issues facing the Debtors, the terms and timing of the sale proposed herein are reasonable and appropriate under the circumstances and will maximize the value of the assets that the Debtors propose to sell.

### The Terms of the Agreement

34.    The Debtors and the Buyer have executed the Agreement for the contemplated sale, subject to the approval of this Court.[11]  A copy of the Agreement, with exhibits and schedules, is attached hereto as **Exhibit A**.  Pursuant to the terms of the Agreement, the Buyer will purchase the Assets (as defined below), and assume certain executory contracts and unexpired leases (the "Assumed Contracts"), subject to the payment of applicable cure obligations, if any, but otherwise free and clear of any liens, claims or encumbrances.

35.    The principal terms of the Agreement are summarized below.  The description below only summarizes certain provisions of the Agreement, and the terms of the

---

[11]  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

Agreement control in the event of any inconsistency.  The Debtors reserve the right to waive or modify any of the following parameters for the sale prior to the sale hearing.

      (a.)   <u>Purchase Price</u>.  As consideration for the Purchaser's acquisition of the Assets, the Debtors will receive the total amount of $10,000,000 in cash, plus the assumption of certain liabilities as set forth in the Agreement and as described below.  *See* Section 2.1.1 of the Agreement.  Specifically, under the Agreement, certain Reclamation Obligations (as defined below) will be assumed and the Buyer will reimburse the Debtors for approximately $3,500,000 of cash collateral that was pledged to secure the Reclamation Obligations.  Such funds will be subject to the liens of the Agent.

      (b.)   <u>Assets</u>.  As described in detail in Section 1.1 of the Agreement, the assets transferred thereunder include all of Mineral Park's and Bluefish's right, title and interest as of the Closing Date in and to the Mineral Park Mine and associated equipment (collectively, the "<u>Assets</u>"), including:

     (1)   all of Mineral Park's and Bluefish's right, title and interest in and to certain executory contracts and unexpired leases, which will be assumed by Mineral Park and Bluefish and assigned to Buyer pursuant to Sections 365(a) and 365(f) of the Bankruptcy Code;

     (2)   certain real property owned by Sellers located in Kingman, Arizona, together with all buildings, structures, improvements and fixtures located thereon, and all easements, rights of way, and other rights and interests appurtenant thereto;

     (3)   the improvements, and appurtenances to such improvements, located on the real property occupied by Mineral Park and Bluefish under the real property leases that will be assumed by Mineral Park and Bluefish and assigned to Buyer, including, without limitation, buildings,

18

outside storage areas, driveways, walkways and parking areas, but in all events only to the extent of Mineral Park's and Bluefish's interest in the same;

(4)    certain items of machinery, equipment, vehicles, and other tangible personal property, including the Bluefish Turbine, owned by either Mineral Park or Bluefish and all other tangible personal property now or hereafter owned by either Mineral Park or Bluefish and used in connection with the Business, including, without limitation, all such furniture, vehicles, machinery, equipment, tools, spare parts, computers, software (to the extent transferable), servers, workstations, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment owned by the Sellers and used in the Business, fixtures and furnishings located at or on the Real Property as of the Closing Date

(5)    certain intangible personal property owned or held by either Mineral Park or Bluefish and used exclusively in connection with the Business, but in all cases only to the extent of such Mineral Park's and Bluefish's interest and only to the extent transferable, together with all books, records and like items pertaining exclusively to the Business, including, without limitation, the names "Mineral Park" and "Bluefish" the goodwill of the Business, patents, processes, trademarks, trade names, service marks, catalogues, data, information (including tangible and intangible information such as drill core, drill logs, assays, metallurgical test work, mine plans and similar information), agreements, files, operating records, operating, safety and maintenance manuals, engineering and design plans, blueprints and as-built plans, specifications, drawings, reports, procedures, facility compliance plans, test records and results, other records and filings made with regulatory agencies regarding operations of the Business, environmental procedures and similar records and employee records for the Employees to the limited extent necessary for the Buyer to comply with applicable law after the Closing Date, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone exchange numbers identified with the Business;

19

(6)     certain supplies, goods, materials, minerals, raw materials, work in process, inventory and stock in trade owned and held by either Seller for use in connection with the operation of the Business, other than Finished Goods (as defined below);

(7)     to the extent transferable and assignable, all of Mineral Park's and Bluefish's respective interests in all licenses, certificates of occupancy, permits, registrations, certificates of public convenience and necessity, approvals, licenses, easements, authorizations and operating rights issued or granted by any governmental authority having jurisdiction over the Business, including any applications therefor which were used prior to the transition to C&M Status and are held for use by either Seller in the operation of the Business (including those that will pass to Buyer as successor in title to the Property by operation of law);

(8)     to the extent of Mineral Park's interest therein, certain unpatented mining claims and similar mining rights of Mineral Park.

(c.)     Excluded Assets.  Notwithstanding anything to the contrary in the Agreement, the Assets shall be limited to the items identified or described in Section 1.1 of the Agreement and shall in any event exclude all of the following (collectively, the "Excluded Assets"):  (i) those items excluded pursuant to the provisions of Section 1.1 of the Agreement; (ii) all cash or cash equivalents, including but not limited to, cash presently securing the Reclamation Obligations, which bonds shall be replaced by Buyer; (iii) Mineral Park's and Bluefish's rights under the Agreement and all cash and non-cash consideration payable or deliverable to Mineral Park and Bluefish pursuant to the terms and provisions thereof; (iv) all insurance proceeds and deposits, overpayments or refunds relating thereto, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to the Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by the

Buyer at the Closing, including without limitation, any rights, claims, or proceeds under any

directors' and officer's liability insurance policy; (v) those real property lease, other leases, or

other Contracts to which either Mineral Park or Bluefish is a party which are not assumed by the

Buyer under the Agreement and those real property leases, other leases, or other contracts which

are not which is not be assumable and assignable as a matter of applicable law (including,

without limitation, any with respect to which any consent requirement in favor of the counter-

party thereto may not be overridden pursuant to Section 365 of the Bankruptcy Code), (vi) all

securities, whether capital stock or debt, of either Mineral Park or Bluefish or any other entity;

(vii) all rights and claims in or to any refunds or credits of or with respect to any taxes,

assessments or similar charges paid by or on behalf of either Mineral Park or Bluefish, in each

case to the extent applicable to any period prior to the Closing; (viii) tax records, minute books,

stock transfer books and corporate seals of either Mineral Park or Bluefish; (ix) except to the

extent acquired at Closing pursuant to Sections 2.4 and 3.5 of the Agreement, all deposits,

security and collateral associated with the Assets, including cash deposits, letters of credit and

any collateral therefor and other collateral, deferred charges and deposits and certain prepaid

expenses associated with the Assets as described in the Agreement; (x) all rights, claims and

causes of action of either Bluefish or Mineral Park against any party whatsoever, including

without limitation, former vendors, officers, directors, employees, members, principals, agents,

and representatives of such Debtor, (xi) all preference or avoidance claims and actions of

Mineral Park and Bluefish, including, without limitation, any such claims and actions arising

under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code; (xii) all accounts receivable

21

of or between the Debtors or either Mineral Park or Bluefish and any affiliate of either Mineral Park or Bluefish; (xiii) all of Mineral Park's or Bluefish's rights in and to any pending litigation and all rights, claims, counterclaims, offsets, and causes of action asserted or which could be asserted therein; (xiv) all instruments, receivables, accounts receivable, accounts payable, accrued liabilities, and unbilled costs and fees attributable to the Business and all causes of action relating or pertaining to the foregoing, (xv) any and all copper cathode, turquoise, or concentrate owned by Sellers as of the Closing that can be sold and delivered to a third party without further processing ("Finished Goods"); (xvi) any employees of either Mineral Park or Bluefish and all employee benefit plans, programs, arrangements and agreements and policies, and any trusts and other related assets thereto; (xvii) any Contract other than the Assumed Contracts; and (xviii) those additional assets, if any, listed on Schedule 1.2.18 of the Agreement.

(d.)    Assumed Liabilities.  The Buyer shall, effective as of the Closing Date, assume from Mineral Park and Bluefish and pay when due, perform, and discharge, in accordance with their terms, without duplication, the following liabilities (collectively, the "Assumed Liabilities"):  (i) all Liabilities and obligations attributable to periods after the Closing under the Real Property Leases and under the Other Leases and Contracts not resulting from any breach or default by, or waiver or extension given by or to, either of Mineral Park or Bluefish; (ii) all Liabilities and obligations arising in the period after the Closing Date in connection with employees of the Buyer, regardless of whether these had previously been employees of Mineral Park or Bluefish; (iii) all Liabilities and obligations arising in the period after the Closing Date in connection with Buyer's use and operation of the Business or its ownership or operation of the

Property, including Liabilities and obligations arising from or relating to the Permits relating to the ownership or operation of the Business or the Property after the Closing Date; (iv) any reclamation-related Liabilities and reclamation obligations arising from or relating to any and all reclamation activities required before, during, and/or following final cessation of, any exploration, mining or processing activities conducted by or in connection with the Property, or required at or on property utilized by the Business, that are required either by applicable law or by Permit (the "Reclamation Obligations") after the Closing Date; (v) Mineral Park's and Bluefish's right, title and interest in and to the Reclamation Documentation and any Liabilities associated with such Reclamation Documentation; (vi) any Liabilities (in addition to the Reclamation Obligations) associated with the environmental matters listed or described on Schedule 2.2.6 attached to the Agreement; (vii) all cure amounts resulting from or payable in connection with the assumption by Debtors of the Assumed Contracts pursuant to Sections 365(a) and 365(f) of the Bankruptcy Code; and (viii) all Liabilities and obligations with respect to any such additional Liabilities and obligations as may be set forth or described on Schedule 2.2.8 to the Agreement.

(e.)    Closing.  The Closing shall be held upon the earlier to occur of (i) the second (2nd) business day following the satisfaction of the last of the conditions set forth in Sections 4.1 and 4.2 of the Agreement, and (ii) January 23, 2015.

(f.)    Representations and Warranties.  The Agreement contains standard representations and warranties for a transaction of this nature.  *See* Agreement, §§ 7 & 8.

DOCS_SF:86814.5 57302-002

(g.)    Termination Fee/Expense Reimbursement.  Although the Debtors do not seek approval of bidding procedures, the Agreement contemplates that the Buyer would be entitled to a termination fee of $300,000 (the "Termination Fee") and expense reimbursement up to $200,000 ("Expense Reimbursement") in the unlikely event that the Court authorizes the sale to the Buyer, but the Debtors consummate a sale of the Assets to another party.  *See* Agreement, § 6.3.

(h.)    "AS-IS" Transaction.  The Buyer shall acknowledge and agree that Mineral Park and Bluefish are selling the Assets "as is", "where is" and with all faults, limitations and defects (hidden and apparent) and subject only to the  representations and warranties contained in the Agreement and the proposed Sale Order, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) whatsoever (all of which lapse and shall cease to be of any further force and effect upon the Closing) as to their title, quality, merchantability, fitness for the Buyer's intended use or a particular purpose or any use or purpose whatsoever, and as to all other matters relating to the Assets (and all portions thereof).  Notwithstanding the foregoing, Mineral Park and Bluefish represent that they have not intentionally omitted or altered any information provided to the Buyer in connection with the Agreement

36.    The Debtors presently believe that in light of their financial situation and limited liquidity, the only viable approach presently available to these estates to maximize value is a sale of the Assets to the Buyer pursuant to the terms of the Agreement.

## Relief Requested

37.    The Debtors are requesting that this Court, *inter alia*, (i) authorize the sale to the Buyer pursuant to the Agreement, free and clear of all liens, claims, encumbrances or other interests pursuant to sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, with such liens, claims, rights, interests and encumbrances (collectively, the "Interests") to attach to the sale proceeds of the Assets with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; (ii) approve the assumption and assignment of the Assumed Contracts under Bankruptcy Code section 365, subject to, and at the time of, closing under the Agreement; and (iii) grant such other relief as may be necessary or appropriate.

## Basis for Relief

### A.    Approval of the Sale

38.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

39.    A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so.  *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F. 3d 389, 395 (3rd Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F. 2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F. 2d 143 (3rd Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir.

1986); *In re Lionel Corp.*, 722 F. 2d 1063 (2nd Cir. 1983); *In re Titusville Country Club*, 128

B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del.

1991)).  The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or

"compelling circumstances" standard, finding the "sound business purpose" standard applicable

and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include:  the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the
> amount of proceeds to be obtained from the sale versus appraised
> values of the Property; and whether the asset is decreasing or
> increasing in value.  124 B.R. at 176.

40.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is

satisfied that there is a sound business reason or an emergency justifying the pre-confirmation

sale, the court must also determine that the trustee has provided the interested parties with

adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is

proceeding in good faith."  *Id*.

41.     The Debtors have proposed the sale of the Assets as the only viable

approach currently available to these estates and have concluded that the sale is supported by a

number of sound business reasons.

42.     As noted above, the Debtors assets have been extensively marketed over

the last four months.  Unfortunately, the Debtors have faced a disastrous commodity pricing

environment that has rendered their mining operations unprofitable.  It is in this context that the

Debtors were forced to commence the transition to C&M Status and have entered into the proposed Agreement with the Buyer to sell the Assets in C&M Status.

43.    Although the Debtors received two going concern expressions of interest for their business, such proposals were not higher or better than the Agreement.  These proposals would have required the Debtors to continue money-losing operations through closing without adequate liquidity and would have included additional assets, such as finished goods inventory and accounts receivable, plus loss of any cash collateral securing the Reclamation Obligations. One proposal also contained a financing contingency and no certainty of reaching a closing in a timely manner.

44.    Mineral Park's lenders also declined to continue to allow their collateral to be dissipated pending the closing of a going concern sale.  Rather, the lenders have approved funding for a transition to C&M Status for the Mineral Park Mine through January 16, 2015. The Debtors have requested a further extension through January 23, 2015, in order to complete the transition to C&M Status and allow sufficient time to close the proposed sale to the Buyer. The Debtors have no funding in place, and no expectation for funding, beyond this date.  Hence, the Debtors urge approval of the proposed sale to the Buyer as the highest and best offer currently available for the Assets.

45.    The sale of the Assets is supported by sound business reasons and is in the best interests of the Debtors and their estates.  Accordingly, the Debtors request approval under section 363(b) of the Bankruptcy Code of the sale to the Buyer, as set forth herein.

**The Proposed Sale Satisfies the Requirements of Section 363(f) of the**
**Bankruptcy Code For a Sale Free and Clear of Liens, Claims, and Interests**

46.    Section 363(f) of the Bankruptcy Code provides:

The trustee may sell Property under subsection (b) or (c) of this
section free and clear of any interest in such Property of an entity
other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such Property
free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such Property is to
be sold is greater than the aggregate value of all liens on such
Property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

47.    Section 363(f) of the Bankruptcy Code provides for the sale of assets "free

and clear of any interests."  The term "any interest," as used in section 363(f), is not defined

anywhere in the Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.

3d 252, 259 (3rd Cir. 2000).  In *Folger Adam*, the Third Circuit specifically addressed the scope

of the term "any interest."  209 F. 3d at 258.  The Third Circuit observed that while some courts

have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in

modern cases is towards "a broader interpretation which includes other obligations that may flow

from ownership of the Property."  *Id.* at 258 (citing 3 COLLIER ON BANKRUPTCY ¶ 363.06[1]).

As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F. 3d 573, 581-582

(4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*,

the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests.  Thus, the Third Circuit in

*Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under §363(f) free

28

and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F. 3d at 258.

48.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all the Interests, except with respect to any Interests that constitute Assumed Liabilities under the Agreement.  *See Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).  The Debtors submit that each Interest that is not an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Buyer, free and clear of all Interests except for the Interests that are Assumed Liabilities under the express terms of the Agreement, with such Interests to attach to the proceeds of the Sale, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Agreement and the proposed Sale Order.  For the avoidance of doubt, the Interests include, and the Assets will be conveyed free and clear of, the claims and liens described in paragraphs 26 through 28 above, including any claims, liens, or interests asserted by Mohave County on account of accrued and unpaid taxes or charges of any kind, including *ad valorem* taxes, and any other parties who assert liens, claims, or interests with respect to the Assets, including but not limited to, the Agent, Silver Wheaton, Daselina, Trafigura, and Fifth Third Bank.

49.      The Debtors have served (or will serve) all purported lienholders notice of this Sale Motion, and will serve notice of any Sale Order approving the relief requested by this Sale Motion.

50.      Accordingly, this Court should approve the sale of the Assets to the Buyer free and clear of Interests under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

51.      Further, the Debtors submit that the Sale should not expose the Buyer to any liability as a successor of the Debtors or their estates.  *See, supra, Folger Adam*, 209 F. 3d at 258.  The Buyer will only be assuming those obligations expressly set forth in the sale agreement.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

52.      Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in turn, that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders at the sale.  *See* 11 U.S.C. § 363(n).  While the Bankruptcy

Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F. 2d 143 (3rd Cir. 1986) held that:

> [t]he requirement that a Buyer act in good faith . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F. 2d at 147 (citations omitted).

53.     The Debtors intend to establish at the sale hearing that the Agreement with the Buyer was a negotiated, arm's-length transaction, in which the Buyer acted in good faith, without collusion or fraud of any kind, and in compliance with the *Abbotts Dairies* standards. The Buyer is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code.  The evidence at the sale hearing will further establish that neither the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code with respect to the consummation of the sale transaction or the transfer of the Assets and the Assumed Contracts to the Buyer.

54.     The Debtors thus request that the Court find that the Buyer has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections and immunities of section 363(m) of the Bankruptcy Code, and that the sale of the Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

## Approval of the Termination Fee and Expense Reimbursement is Appropriate

55.     As described above, the Agreement at section 6.3 contemplates the payment of a Termination Fee and Expense Reimbursement to the Buyer under limited

circumstances where the Agreement is approved by this Court, but the Debtors nonetheless close

a sale of the Assets to another party.  Under such narrow and unlikely set of circumstances, the

Termination Fee and Expense Reimbursement would be payable to the Buyer solely out of the

proceeds of such alternative transaction.  The Buyer negotiated for such protections in order to

ensure that the Debtors would stand behind the Agreement and, as a result, the Buyer has been

encouraged to expend the necessary time, effort, and resources on a transaction with the Debtors.

Consistent with the Agreement, the Debtors seek approval of the Termination Fee and Expense

Reimbursement as part of the sale order.

56.     Bidding incentives encourage a potential purchaser to invest resources in a

transaction with a debtor, despite the inherent risks and uncertainties of the chapter 11 process.

Historically, bankruptcy courts have approved bidding incentives similar to the Termination Fee

and Expense Reimbursement, under the "business judgment rule," which proscribes judicial

second-guessing of the actions of a corporation's board of directors taken in good faith and in the

exercise of honest judgment.  *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to

enter the bidding by providing some form of compensation for the risks it is undertaking")

(internal quotation marks and citation omitted).

57.     The Third Circuit has established standards for determining the

appropriateness of bidding incentives in the bankruptcy context.  *In re Calpine Corp. v. O'Brien

Envtl. Energy, Inc.*, 181 F. 3d 527 (3rd Cir. 1999), the court held that even though bidding

incentives are measured against a business judgment standard in nonbankruptcy transactions, the

DOCS_SF:86814.5 57302-002

administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates.  *See id.* at 533.

58.    The *O'Brien* court identified at least two instances in which bidding incentives such as expense reimbursements and breakup fees may provide benefit to the estate. First, benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

59.    Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Debtors' proposed authority to approve the Termination Fee and Expense Reimbursement in these cases passes muster.  The Termination Fee and Expense Reimbursement are fair and reasonable in amount, and are reasonably intended to compensate for the risk that the Buyer is taking by setting a baseline price for the Assets and investing resources in making a bid.  At the same time, given that there are no bidding procedures as part of the proposed sale and no contemplation of an auction, the Termination Fee and Expense Reimbursement would only be payable in the unlikely event that the Court

33

approved the Agreement, but the Debtors opted to close a sale of the Assets with another party and, even then, solely out of the proceeds of such alternative transaction.

60.    Further, the Termination Fee, which totals 3.0% of the cash or cash equivalent portion of the purchase price, prior to any adjustments thereto, is within the spectrum of expense reimbursement and termination fees approved by bankruptcy courts in chapter 11 cases. *See e.g., In re Constar International Holdings LLC, et al.*, Case No. 13-13281 (CSS) (Bankr. D. Del. January 23, 2009) (court approved a break-up fee of approximately 3.0% or $2,100,000 in connection with sale); *In re Green Field Energy Services, Inc, et al.*, Case No. 13-12783 (KG) (Bankr. D. Del. Jan. 19, 2014) (court approved break-up of approximately 2.0% or $1,000,000); *In re Savient Pharmaceuticals, Inc.*, Case No. 13-12680 (MFW) (Bankr. D. Del. November 4, 2013) (court approved break-up fee of $1,650,000 or 3.0% in connection with sale); *In re Fresh & Easy Neighborhood Market Inc., et al.*, Case No. 13-12569 (KJC) (Bankr. D. Del. November 24, 2013) (break-up fee of $1,500,000 or 1.2% in connection with sale); *In re AgFeed USA, LLC, et al.*, Case No. 13-11761 (BLS) (Bankr. D. Del. October 10, 2013) (court approved break-up fee of $2,370,000 or 3.0% in connection with sale); *In re Orchard Supply Hardware Stores Corporation, LLC, et al.*, Case No. 13-11565 (CSS) (Bankr. D. Del. July 8, 2013 (court approved a break-up fee of approximately $6,200,000, or 3.0%, in connection with sale  *In re Monaco Coach Corporation, et al.*, Case No. 09-10750 (KJC) (Bankr. D. Del. May 1, 2009) (court approved a break up fee of approximately 5.77%, or $3,000,000, in connection with sale); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 4, 2009) (court approved a break up fee of approximately 3.68% in connection with sale)*; In re*

*Champion Enterprises, Inc. et al.*, Case No. 09-14019 (KG) (Bankr. D. Del. November 14, 2009)

(court approved a break up fee and expense reimbursement that totals less than 3% of total

amount of credit bid, or no more than $4,000,000, in connection with sale*); In re Global*

*Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008)

(court approved a breakup fee of approximately 4%, or $500,000 in connection with sale).

       61.     For the reasons set forth above, the Debtors respectfully request approval

of the Termination Fee and Expense Reimbursement as part of the Agreement.

**B.**      **Authorization of Assumption and Assignment of Assumed Contracts**

       62.     In order to enhance the value to the Debtors' estates, the Debtors request

approval of the assumption and assignment of the Assumed Contracts identified on Schedule

1.1.1 to the Agreement[12] to the Buyer upon the Closing of the transactions contemplated under

the Agreement and payment of the cure costs (the "Cure Costs") set forth in separate cure notices

served concurrently with this Sale Motion, which amounts, if any, are what the Debtors believe

are owed to each counterparty (each a "Counterparty," and collectively, the "Counterparties") to

an Assumed Contract in order to cure any defaults that exist under such contract or lease.

       63.     If a contract or lease is assumed and assigned pursuant to the Court's order

approving same, then unless the affected Counterparty properly files and serves an objection to

the Cure Costs, the Counterparty will receive at the time of the Closing (or as soon as reasonably

practicable thereafter) the Cure Costs, with payment made pursuant to the terms of Agreement.

---

[12]  The inclusion of any agreement as an Assumed Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included as an Assumed Contract.

64.     The Buyer, on behalf of the Debtors, shall promptly pay or cause to be paid the Cure Costs with respect to the Assumed Contracts.  The Buyer shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts.  The Debtors propose that the Court make its determinations concerning the Cure Costs and adequate assurance of future performance under the Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code at the sale hearing or in the case of any Assumed Contracts not assumed and assigned to the Buyer at the sale hearing, at such other hearing to approve assumption and assignment of such Assumed Contract to the Buyer.

65.     Except to the extent otherwise provided in the Agreement entered into with the Buyer, subject to the payment of any Cure Costs, the assignee of an Assumed Contract will not be subject to any liability to the assigned contract or lease counterparty that accrued or arose before the closing date of the sale of the Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

66.     The Debtors further request that the sale order provide that the Assumed Contracts will be assigned to, and remain in full force and effect for the benefit of the Buyer, notwithstanding any provisions in the Assumed Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

67.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –

36

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11  U.S.C. § 365(b)(1).

68.    Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *In re Talco, Inc.*, 558 F. 2d 1369, 1173 (10th Cir. 1977).  A debtor satisfies the "business judgment" test when it determines, in good

faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The assumption and assignment of the Assumed Contracts, or any of them, will be a necessary part of the proposed Sale and, as stated above, will benefit the estates of the Debtors.

69.     With respect to Assumed Contracts to be assumed and assigned pursuant to the Sale, the Debtors will have sent a copy of a "Cure Notice" to all Counterparties to the Assigned Contracts, notifying such Counterparties of the potential assumption by the Debtors and assignment to the Buyer of the Assigned Contracts at the Closing.

70.     The Counterparties will have sufficient opportunity to file an objection to the proposed Cure Costs. To the extent no objection is filed with regard to a particular cure amount, such cure amount shall be binding on the applicable contract or lease counterparty. The payment of the Cure Costs will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular contract is not truly executory, and does not need to be cured to transfer the Assets to the Buyer.

71.     Cure Costs disputed by any Counterparties, with respect to any Assumed Contracts to be assumed and assigned to the Buyer at the Closing, will be resolved by the Court at the sale hearing or other hearing as set forth above.

72.     The Buyer is responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of

any Assumed Contracts.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989)*; see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Buyer shall provide evidence of its ability to provide adequate assurances to Counterparties at the sale hearing.

### C.    Waiver of Automatic Fourteen-Day Stay under Bankruptcy Rules 6004(h) and 6006(d)

73.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

74.     Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, commentators agree that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  *See generally* 10 COLLIER ON BANKRUPTCY ¶ 6004.09 (15th ed. 1999).   Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*

75.     Because of the potentially diminishing value of the Assets and the anticipated expiration of access to cash collateral by no later than January 23, 2015, the Debtors must close this sale promptly after all closing conditions have been met or waived.  Thus, waiver of any applicable stay is appropriate in this circumstance.

## **Notice**

76.     Concurrently with this filing, copies of this Sale Motion (which sets forth various requested dates relating to the sale) will be provided to (a) the Office of the United States Trustee; (b) counsel to the Creditors' Committee; (c) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; (d) all parties who assert liens with respect to the Assets and all parties who hold direct or indirect interests in such liens, including, but not limited to, the Agent, Silver Wheaton, Mohave County, Daselina, Trafigura, and Fifth Third Bank; (e) all entities known to have expressed an interest in bidding on the Assets; (f) all counterparties to Assumed Contracts; (g) the United States Attorney's office; (h) all state attorneys general in states in

40

which the Assets are located; (i) the Internal Revenue Service; (j) for each state in which the Assets are located, the applicable taxing authorities; and (k) environmental authorities in the states or smaller applicable jurisdictions in which the Debtors do business.  The Debtors respectfully submit that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

77.    The Debtors submit that the notice that they have provided and intend to provide of this Sale Motion and the sale hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

78.    The Debtors request, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

## No Prior Request

79.    No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Sale Motion and authorize the sale of the Assets to the Buyer and approve the proposed Agreement in substantially the form attached to this Sale Motion, pursuant to the attached proposed order; (ii) approve the assumption and assignment of the Assumed Contracts in accordance with the Agreement; (iii) approve the form and manner of notice of this Sale Motion, and of the proposed Sale and assumptions and assignments; and (iv) grant such other and further relief as is just and proper.

41

Dated:  January 7, 2015       PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
    Jeremy V. Richards (CA Bar No. 102300)
    Maxim B. Litvak (CA Bar No. 215852)
    James E. O'Neill (Bar No. 4042)
    Colin R. Robinson (Bar No. 5524)
    919 North Market Street, 17th Floor
    P.O. Box 8705
    Wilmington, DE  19899-8705
    Telephone: 302/652-4100
    Facsimile:  302/652-4400
    E-mail:     jrichards@pszjlaw.com
            mlitvak@pszjlaw.com
            joneill@pszjlaw.com
            crobinson@pszjlaw.com

    Counsel for the Debtors and Debtors in Possession

DOCS_SF:86814.5 57302-002